833 A.2d 1070

**Wesley Eugene BAKER**

v.

**STATE of Maryland.**

**No. 109, Sept. Term, 2002.**

Court of Appeals of Maryland.

Oct. 17, 2003.

**568**

Stuart Jay Robinson, Bel Air, for appellant.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., on brief), for appellee.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BELL, C.J.

The issue in this case is whether, pursuant to a collateral attack, we should vacate as illegal, the sentence of a judge, who was appointed pursuant to the Maryland Constitution and duly elected to the Circuit Court for Harford County, but who

may have lived outside of Harford County for a period of time during his term, in contravention to the residency requirements for state judges enumerated in the Maryland Constitution. The Circuit Court for Harford County denied the petitioner's motions attacking the of the Circuit Court judge in this case. We shall affirm.

## I.

Neither the facts underlying the petitioner's conviction, nor the procedural history of the case is relevant to the disposition of the case *sub judice*, except to the extent that they elucidate the timing and measure of the involvement of the particular judge whose judicial acts are at issue in this case.[1] This issue at bar arose following the petitioner's murder trial.

---

1. The facts supporting the petitioner's conviction for first degree murder were recounted most recently by this Court in *Baker v. State*, 367 Md. 648, 790 A.2d 629 (2002) (*"Baker II"*) and, previously, in *Baker v. State*, 332 Md. 542, 632 A.2d 783 (1993) (*"Baker I"*). They reveal that this court affirmed the petitioner's conviction and death sentence on November 12, 1993, *Baker I, supra*, 332 Md. at 546–71, 632 A.2d at 784, and his Petition for Writ of Certiorari was denied by the United States Supreme Court. *See Baker v. Maryland*, 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994). Subsequently, the petitioner has sought post conviction relief, albeit unsuccessfully. After the Supreme Court denied certiorari, he filed a Petition for Post Conviction Relief in the Circuit Court for Harford County. The court rejected his allegations of various violations of his constitutional right to a fair and impartial jury and effective assistance of trial counsel and denied his petition.

Thereafter, the petitioner filed a Motion to Reopen the Post Conviction Proceeding. The Circuit Court denied that petition. The petitioner then filed in the United States District Court for the District of Maryland, a petition for habeas corpus relief. That court's denial of the habeas corpus relief was affirmed by the United States Court of Appeals for the Fourth Circuit, *Baker v. Corcoran*, 220 F.3d 276 (4th Cir.2000), and the United States Supreme Court declined further review. *Baker v. Corcoran*, 531 U.S. 1193, 121 S.Ct. 1194, 149 L.Ed.2d 110 (2001).

Once again, the petitioner sought post conviction relief in the Circuit Court for Harford County, filing two new motions: a Motion for New Sentencing based on newly discovered evidence and a Motion to Correct Illegal Sentence and/or for New Sentencing Based Upon Mistake and Irregularity in the Circuit Court for Harford County. The court, Judge Whitfill presiding, denied both motions, prompting the petitioner to note an appeal to this Court. *Baker II, supra*, 367 Md. at 663–64, 790 A.2d at 638–39. We affirmed the judgments of the Circuit

After a jury convicted the petitioner, Wesley Eugene Baker, Harford County Circuit Court Judge, Cypert O. Whitfill, sentenced him to death.[2] Following an unsuccessful direct appeal and unsuccessful collateral attacks on the judgment, Judge Whitfill signed a warrant of execution directing that the petitioner be executed during the week of May 13, 2002. Subsequently, the petitioner filed motions in the Circuit Court for Harford County to quash Judge Whitfill's sentence and execution warrant. He alleged that the warrants had been issued without jurisdiction.[3] More particularly, he maintained

---

Court, *id.* at 698, 790 A.2d at 659, and denied the petitioner's motion for reconsideration.

After Judge Whitfill signed the warrant of execution, the petitioner asked this Court to stay his execution, pending the filing of a writ of certiorari and application for stay of execution with the United States Supreme Court to challenge our decision affirming the Circuit Court's denial of post-conviction relief. We declined to do so. His subsequently filed petition for writ of certiorari and application for stay of execution was denied by the United States Supreme Court. *See Baker v. Maryland,* 535 U.S. 1050, 122 S.Ct. 1814, 152 L.Ed.2d 817 (2002). The Circuit Court declined the petitioner's invitation to reopen his state post conviction proceedings.

The petitioner earlier had filed a motion to reopen post conviction proceedings, claiming racial discrimination in sentencing. Citing the same reasoning, he also moved this Court to recall its mandate from the petitioner's direct appeal. We denied the motion. By order dated May 9, 2002, the Court denied the petitioner's application for leave to appeal the decision denying his second motion to reopen post conviction proceedings and the accompanying motion to stay warrant of execution.

2. The petitioner elected to have Judge Whitfill, rather than the jury, decide the sentencing phase of his capital case.

3. On March 19, 2002 the petitioner filed three motions in the Circuit Court for Harford County styled: Defendant's Emergency Motion to Quash/Strike Both Illegal Sentence and Warrant of Execution for Lack of Jurisdiction by the Trial Judge and Judicial Authority Pursuant to Maryland Rule 4–345, Memorandum, Exhibits, Requests an Emergency Hearing and Other Relief; Defendant's Emergency Motion to Stay Warrant of Execution Pending a Hearing on the Defendant's Motion for Illegal Sentence, Quashing Warrant, Recusal, Other Relief and Exhibits as the Defendant's Execution is Imminent Commencing the Week of May 13, 2002; and Defendant's Emergency Motion for Recusal of Judge Cypert O. Whitfill and Fellow Judges, Both Active and Retired from the Circuit Court and District Courts of Harford County, Maryland from Participating in Any Further Proceedings as the Presiding Judge

that Judge Whitfill was not constitutionally qualified to preside at the petitioner's trial for first degree murder, or to sign the warrant for the petitioner's execution because, although appointed to the Harford County bench pursuant to the Maryland Constitution and duly elected by the voters of that county, Judge Whitfill lost his jurisdiction to preside over cases in Harford County when he changed his actual residence from Harford County to Baltimore County for some period during his term. Specifically, the petitioner alleged that, at some point prior to the petitioner's trial, Judge Whitfill ceased to meet the residency requirements imposed upon State judges by Article IV, Section 2 of the Maryland Constitution.[4] Thus, the petitioner maintained, the sentence Judge Whitfill imposed on him was "illegal," at the time of its imposition. Although the petitioner conceded that Judge Whitfill's alleged change in residence occurred prior to his trial and conviction, he argued nevertheless that the change "divested [Judge Whitfill] of the judicial power and authority to preside over the Sentencing Hearing on October 26, 1992."

The matter was assigned to the Honorable John G. Turnbull, II, of the Circuit Court for Baltimore County, who denied

---

Relating to the Defendant, Wesley Baker, Exhibit Index and Request for Hearing.

4. Article IV, Section 2 of the Maryland Constitution provides:
   "The Judges of all of the said Courts shall be citizens of the State of Maryland, and qualified voters under this Constitution, and shall have resided therein not less than five years, and not less than six months next preceding their election, or appointment, as the case may be, in the city, county, district, judicial circuit, intermediate appellate judicial circuit or appellate judicial circuit for which they may be, respectively, elected or appointed. They shall be not less than thirty years of age at the time of their election or appointment, and shall be selected from those who have been admitted to practice law in this State, and who are most distinguished for integrity, wisdom and sound legal knowledge."
   The constitutional provision refers to the Judicial circuit to which a judge may be elected or appointed. We do not decide whether, after appointment or election, residence by the judge in the judicial circuit, as opposed to the County, in which the court to which he or she was appointed, would be in compliance with the constitutional requirement.

the petitioner's motions without a hearing. The petitioner noted an appeal to the Court of Special Appeals. Prior to any proceedings in the intermediate appellate court, the case was transferred to this Court, pursuant to Md.Code (1973, 2002 Repl.Vol.) § 12–307 of the Courts and Judicial Proceedings Article [5] and Maryland Rule 8–132.[6]

In this Court, the petitioner maintains that although Judge Whitfill was a resident of Harford County during his trial, his sentencing and all times thereafter, Judge Whitfill's earlier change of residence from Harford County to Baltimore County divested him of his judicial authority immediately upon its occurrence and by operation of law. The petitioner insists that the Judge's judicial authority could not be regained by simply reestablishing a residence in Harford County. In support of his position, the petitioner relies upon this Court's precedents regarding challenges to the constitutional residency requirements of non-judicial elected officials. *See generally, Oglesby v. Williams*, 372 Md. 360, 812 A.2d 1061 (2002); *Stevenson v. Steele*, 352 Md. 60, 720 A.2d 1176 (1998); *Blount*

---

5.  Maryland Code (1973, 2002 Repl.Vol.) § 12–307 of the Court and Judicial Proceedings Article provides:

    "The Court of Appeals has:

    "(1) Jurisdiction to review a case or proceeding pending in or decided by the Court of Special Appeals in accordance with Subtitle 2 of this title;

    "(2) Jurisdiction to review a case or proceeding decided by a circuit court in accordance with § 12–305 of this subtitle

    "(3) Exclusive appellate jurisdiction with respect to a question of law certified to it under the Uniform Certification of Questions of Law Act; and

    "(4) Exclusive appellate jurisdiction over a criminal case in which the death penalty is imposed and any appellate proceedings under § 3–904 of the Correctional Services Article."

6.  Maryland Rule 8–132 provides:

    *"Transfer of Appeal Improperly Taken*

    If the Court of Appeals or the Court of Special Appeals determines that an appellant has improperly noted an appeal to it but may be entitled to appeal to another court exercising appellate jurisdiction, the Court shall not dismiss the appeal but shall instead transfer the action to the court apparently having jurisdiction upon the payment of costs provided in the order transferring the action."

*v.Boston,* 351 Md. 360, 718 A.2d 1111 (1998); *Bainum v. Kalen,* 272 Md. 490, 325 A.2d 392 (1974).

The respondent rejoins that there is no support for the petitioner's argument, and that the fact that Judge Whitfill may have, temporarily maintained a residence in Baltimore County, rather than Harford County, did not evince any intent to abandon his Harford County domicile. The respondent also relies on the *"de facto* officer" doctrine. Directing our attention to *Nguyen v. U.S.,* —— U.S. ——, 123 S.Ct. 2130, 156 L.Ed.2d 64 (2003), then under review, and, subsequently decided by the United States Supreme Court, the State argues that, under the *de facto* officer doctrine, the acts of public officials acting under color of title are presumed to be valid even if it is later discovered that there are deficiencies in the official's appointment or election to office. Thus, the State asserts that a defect in Judge Whitfill's judicial authority may not be challenged in post-conviction proceedings. Consequently, the State maintains that the petitioner has missed his opportunity to challenge the alleged defect.

## II.

Neither party disputes that Judge Whitfill was qualified for, and duly elected to the office of judge of the Circuit Court for Harford County when he presided and imposed sentence in the petitioner's case. Therefore, the only question before this Court concerns how a fully qualified and validly elected judge may be removed from office, or be found to have vacated the office. Accordingly, we must decide whether Judge Whitfill's exercise of judicial authority may be collaterally attacked in a post-conviction proceeding.

The Maryland Constitution vests "[t]he judicial power of this State in a Court of Appeals, such intermediate courts of appeal as the General Assembly may create by law, Circuit Courts, Orphans' Courts, and a District Court." *See* Article IV, Section 1 of the Maryland Constitution. Article IV also delineates the constitutional qualifications of judges. *See* Article IV, Section 2 of the Maryland Constitution, note 4 *supra.*

Moreover, the Constitution addresses the grounds and procedures for removal of judges. Article 33 of the Maryland Declaration of Rights of the Maryland Constitution expressly proscribes the removal of judges "except in the manner, and for the causes provided in this Constitution." Article IV, Section 4 enumerates the grounds and procedures for said removal, providing:

> Section 4. Grounds and procedure for removal of judges
> "Any Judge shall be removed from office by the Governor, on conviction in a Court of Law, of incompetency, of wilful neglect of duty, misbehavior in office, or any other crime, or on impeachment, according to this Constitution, or the Laws of the State; or on the address of the General Assembly, two-thirds of each House concurring in such address, and the accused having been notified of the charges against him, and having had opportunity of making his defence."

Section 5 of the same article states, in relevant part, that a Circuit Court judge "shall hold the [office of Circuit Court judge] until the election and qualification of his successor." *Md. Const., Art. 4, § 5.* Significantly, there is no constitutional provision that provides that the judges of this State may be divested of judicial authority by operation of law or that permits collateral attack on the authority of a judge based solely on that judge's change of residence.

As early as 1886, the United States Supreme Court recognized that the acts of public officials acting under color of title are presumed to be valid, even though it is later discovered that the legality of that person's appointment or election to office is deficient. *Norton v. Shelby County,* 118 U.S. 425, 441–42, 6 S.Ct. 1121, 1125, 30 L.Ed. 178, 186 (1886). As the Court explained:

> "[t]he doctrine which gives validity to acts of officers *de facto,* whatever defects there may be in the legality of their appointment or election, is founded upon considerations of policy and necessity, for the protection of the public and individuals whose interests may be affected thereby. Offices are created for the benefit of the public, and private

parties are not permitted to inquire into the title of persons clothed with the evidence of such offices and in apparent possession of their powers and functions. For the good order and peace of society their authority is to be respected and obeyed until in some regular mode prescribed by law, their title is investigated and determined. It is manifest that endless confusion would result if in every proceeding before such officers their title could be called in question."

*Id.* The Court also recognized, however, that the doctrine was not absolute, pointing out that "the idea of an officer implies the existence of an office which he holds. It would be a misapplication of terms to call one an 'officer' who holds no office, and a public office can exist only by force of law." *Id.*

In *Norton,* the dispositive issue was whether the statutorily created Tennessee Board of Commissioners had the legal authority to issue bonds to finance a county subscription to the Mississippi River Railroad Company. Prior to the passage of the act empowering county commissioners to issue the bonds, that authority resided with the county court and the justices of the peace. The Supreme Court of Tennessee held that the act creating the Board of Commissioners and conferring on the commissioners the powers of the justices of the peace was unconstitutional and void. The United States Supreme Court affirmed, holding that the commissioners could not appropriately carry out actions that were exclusively constitutionally reserved for justices of the peace. To that end, the Court reasoned:

"[F]or the existence of a de facto officer, there must be an office de jure.... Where no office legally exists, the pretended officer is merely a usurper, to whose acts no validity can be attached; and such, in our judgment, was the position of the commissioners of Shelby County who undertook to act as the county court, which could be constitutionally held only by justices of the peace. Their right to discharge the duties of justices of the peace was never recognized by the justices, but from the outset was resisted by legal proceedings, which terminated in an adjudication

that they were usurpers, clothed with no authority or official function."

*Id.* at 449, 6 S.Ct. at 1129, 30 L.Ed. at 188.

The Supreme Court applied the *de facto* officer doctrine it had enunciated in *Norton,* in *Ball v. United States,* 140 U.S. 118, 11 S.Ct. 761, 35 L.Ed. 377 (1891). The issue in that case was whether the official acts of a *de facto* judge can be collaterally attacked. In *Ball,* a federal district judge from the Western District of Louisiana was assigned to sit in the Eastern District of Texas for the resident judge, who had fallen ill and subsequently died. The circuit judge who appointed him duly filed with the court clerk the appointment certificate required by law, which enumerated that the federal District Judge would serve for the then-current November 1888 term and the pending 1889 terms. *Id.* at 127, 11 S.Ct. at 764, 35 L.Ed. at 381–82. After the 1888 and 1889 terms expired, however, the replacement judge continued to sit in the Eastern District of Texas without official written authority. Three defendants convicted of murder and sentenced to death after trials in the Eastern District of Texas challenged the authority of the judge, contending that he had not been officially appointed. The Supreme Court rejected the challenge. The Court determined, as to the term for which there was no new appointment filed, that the assigned judge "was a judge *de facto,* if not *de jure,* and his acts as such are not open to collateral attack." 140 U.S. at 128–129, 11 S.Ct. at 765, 35 L.Ed. at 382.

Similarly, in *McDowell v. United States,* 159 U.S. 596, 16 S.Ct. 111, 40 L.Ed. 271 (1895), the *de facto* officer doctrine was applied to resolve the issue of whether "the power of a Circuit Judge or Justice to call one District Judge from his own into another district ... extend[s] to cases in which there is a vacancy in the office of judge of the latter district." *Id.* at 598, 16 S.Ct. at 111, 40 L.Ed. at 272. In that case, a district judge from another district in the Fourth Circuit was temporarily assigned to fill a vacancy in the United States District Court for the District of South Carolina until the vacancy was permanently filled. The Court determined that the assign-

ment of the one district judge to sit in another district involved no "trespass upon the executive power of appointment," *id.* at 598, 16 S.Ct. at 112, 40 L.Ed. at 272, and, in any event, the assigned judge was a "judge *de facto*," whose "actions as such, so far as they affect third persons, are not open to question." *Id.* at 601, 16 S.Ct. at 112, 40 L. Ed at 272. The Court elucidated:

> The time and place of a regular term of the District Court were fixed by law at Greenville, on the first Monday of February. Judge Seymour was a judge of the United States District Court, having all the powers attached to such office. He appeared at the time and place fixed by law for the regular term, and actually held that term. The Circuit Judge had, generally speaking, the power of designating the judge of some other district to do the work of the District Judge in this district. The order of designation was regular in form, and there was nothing on its face to suggest that there was any vacancy in the office of District Judge for the District of South Carolina. Any defect in the order, if defect there was, is shown only by matters dehors the record. While this may not be conclusive, it strongly sustains the contention of the government that Judge Seymour was, while holding that term, at least a judge *de facto*. Whatever doubt there may be as to the power of designation attaching in this particular emergency, the fact is that Judge Seymour was acting by virtue of an appointment, regular on its face, and the rule is well settled that where there is an office to be filled and one acting under color of authority fills the office and discharges its duties, his actions are those of an officer *de facto* and binding upon the public. Of course, if he was judge *de facto* his orders or the continuance of the term from day to day until February 12, when the regular judge took his place upon the bench, were orders which cannot be questioned, and the term was kept alive by such orders until Judge Brawley arrived.

*Id.* at 601–602, 16 S.Ct. at 113, 40 L.Ed. at 273–74.

Along the same lines, in *Ex Parte Ward,* 173 U.S. 452, 19 S.Ct. 459, 43 L.Ed. 765 (1899), a petitioner sought habeas

corpus relief, challenging the authority of the judge that sentenced him on the grounds that the judge's appointment during a Senate recess was improper. The Court denied relief, holding that "the title of a person acting with color of authority, even if he be not a good officer in point of law, cannot be collaterally attacked." *Id.* 173 U.S. at 456, 19 S.Ct. at 460, 43 L.Ed. at 766. The Court declined to address the petitioner's constitutional arguments on the

> "well settled rule . . . that where a court has jurisdiction of an offence, and of the accused, and the proceedings are otherwise regular, a conviction is lawful although the judge holding the court may be only an officer *de facto;* and that the validity of the title of such judge to the office, or his right to exercise the judicial functions, cannot be determined on a writ of habeas corpus."

*Id.* at 454, 19 S.Ct. at 460, 43 L.Ed. at 766.

On the other hand, when the authority of the public official is raised before the official acts or on direct review, the Supreme Court has reached a different conclusion. *Ryder v. United States,* 515 U.S. 177, 115 S.Ct. 2031, 132 L.Ed.2d 136 (1995). Thus, in *Ryder,* where the defendant challenged, while his case was pending, the assignment of two civilian judges to his three-judge Coast Guard Court Military Review panel, the Court rejected the application of the *de facto* officer doctrine and entertained the challenge. Acknowledging the Court's reliance upon the doctrine "in several cases involving challenges by criminal defendants to the authority of a judge who participated in some part of the proceeding leading to their conviction and sentence," *id.* at 181, 115 S.Ct. at 2034, 132 L.Ed.2d at 142, the Court determined that the doctrine was inapplicable because the defendant promptly objected to the composition of the Coast Guard Court of Military Review. *Id.* at 182, 115 S.Ct. at 2035, 132 L.Ed.2d at 143. Unlike the defendants in *Ball, McDowell* and *Ward,* the Court explained, Ryder directly challenged the composition of the three judge panel while his case was pending before that very court. *Id.* The Court then agreed with Ryder that the composition of the three-judge panel violated the Appointment Clause of Article

II of the United States Constitution. *Id.* at 187–88, 115 S.Ct. at 2038, 132 L.Ed.2d at 146–47.

Most recently, the Supreme Court has stated that it will not apply the *de facto* officer doctrine when the error results not from an irregularity in an otherwise proper judicial designation, but from one that is statutorily impermissible. *Nguyen v. United States,* —— U.S. ——, ——, 123 S.Ct. 2130, 2131, 156 L.Ed.2d 64, 72 (2003). *Nguyen* was an appeal from convictions for federal narcotic offenses. The petitioners in that case objected to the assignment of an Article IV territorial court judge to their Court of Appeals panel; however, unlike the petitioner in *Ryder,* the petitioners in *Nguyen* did not object to the composition of the panel while their case was pending in the Court of Appeals, but raised the issue in their Petitions for Certiorari filed with the Supreme Court. The Government argued that the *de facto* officer doctrine applied and, therefore, the convictions should be upheld. The Supreme Court disagreed. Vacating the judgments of conviction, the Court acknowledged that "[t]ypically [it had] found a judge's actions to be valid *de facto* when there is a merely 'technical' defect of statutory authority," *id.,* at ——, 123 S.Ct. at 2136, 156 L.Ed.2d at 76, quoting *Glidden Co. v. Zdanok,* 370 U.S. 530, 535, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962), but contrasted that general proposition with its determination "to correct, at least on direct review, violations of a statutory provision that embodies a strong policy concerning the proper administration of judicial business' even though the defect was not raised in a timely manner." *Id.,* (quoting *Glidden, supra,* 370 U.S. at 536, 82 S.Ct. at 1459, 8 L.Ed.2d at 671). The Court explained:

"In *American Constr. Co. v. Jacksonville, T & K W R Co.,* 148 U.S. 372, 13 S.Ct. 758, 37 L.Ed. 486 (1893), the case Justice Harlan cited for this proposition in *Glidden,* a judgment of the Circuit Court of Appeals was challenged because one member of that court had been prohibited by statute from taking part in the hearing and decision of the appeal. This Court succinctly observed: 'If the statute made him incompetent to sit at the hearing, the decree in which he took part was unlawful, and perhaps absolutely

void, and should certainly be set aside or quashed by any court having authority to review it by appeal, error or certiorari.' *Id.*, at 387, 13 S.Ct. 758, 37 L.Ed. 486. The *American Constr. Co.* rule was again applied in *William Cramp & Sons Ship & Engine Building Co. v. International Curtiss Marine Turbine Co.*, 228 U.S. 645, 33 S.Ct. 722, 57 L.Ed. 1003 (1913), even though the parties had consented in the Circuit Court of Appeals to the participation of a District Judge who was not permitted by statute to consider the appeal. *Id.*, at 650, 33 S.Ct. 722. Rather than sift through the underlying merits, we remanded the case to the Circuit Court of Appeals 'so that the case may be heard by a competent court, [organized] conformably to the requirements of the statute.' *Id.*, at 651, 33 S.Ct. 722, 57 L.Ed. 1003. See also *Moran v. Dillingham*, 174 U.S. 153, 158, 19 S.Ct. 620, 43 L.Ed. 930 (1899) ('This court, without considering whether that decree was or was not erroneous in other respects, orders the Decree of the Circuit Court of Appeals be set aside and quashed, and the case remanded to that court to be there heard and determined according to law by a bench of competent judges . . . .')."

*Nguyen*, —— U.S. at ——, 123 S.Ct. at 2136, 156 L.Ed.2d at 76–77.

The Court drew a distinction between its decisions in *McDowell* and *Ball* and its decision in *Nguyen* reasoning that, in *McDowell* and *Ball*, the judges were constitutionally qualified to preside over the involved proceedings and the error in those cases were "technical" in nature. *Id.* at 2137, 156 L.Ed.2d at 77. By contrast, the Court reasoned that because Congress did not contemplate the assigning of an Article IV judge to an Article III Appellate Panel, the inclusion of the Article IV judge in *Nguyen* was inherently improper and thus, the panel lacked jurisdiction to decide that appellant's appeal. To that end, the Court stated that "[t]he difference between the irregular judicial designations in *McDowell* and *Ball* and the impermissible panel designation in the instant cases is therefore a difference between an action which could have been taken, if properly pursued, and one which could never have been taken at all." *Id.*

This Court has also applied the *de facto* officer doctrine in connection with judicial and other government officials. In *Izer v. State,* 77 Md. 110, 26 A. 282 (1893), at issue was the validity of the oath administered to the accused by the deputy clerk of the Allegany County Circuit Court. Particularly, the petitioner alleged that the clerk had neither been reappointed to the office, nor administered a new oath of office. Upholding the validity of the oath the clerk administered, we explained:

"Of course, if Izer was never legally sworn to give testimony before the grand jury, no false statement made by him before that body could constitute indictable perjury; and if Williamson had no authority to administer to Izer the oath he did administer, Izer was not legally sworn. But Wlliamson was then in the undisputed possession of the office of deputy clerk and since 1886 had openly and notoriously discharged the duties pertaining thereto. He was at least a *de facto* officer, filling a *de jure* office, and whatever defects or irregularities there may have been in the manner of his appointment or qualification, his acts, done under color of title, are, upon grounds of public policy and necessity, valid and binding." *Norton v. Shelby County,* 118 U.S. 425, 6 S.Ct. 1121, 30 L.Ed. 178. Or, as was said in *Carleton v. The People,* 10 Mich. 250: "All that is required when there is an office, to make an officer *de facto,* is that the individual claiming the office is in possession of it, performing its duties and claiming to be such officer under color of an election or appointment, as the case may be. It is not necessary that his election or appointment be valid, for that would make him an officer *de jure.* The official acts of such persons are recognized as valid on grounds of public policy, and for the protection of those having official business to transact." *See also, State v. Carroll,* 38 Conn. 449; *Clark v. Commonwealth,* 29 Pa. 129; *Sheehan's Case,* 122 Mass. 445; *State v. Speaks,* 95 N.C. 689."

*Id.* 77 Md. at 115, 26 A. at 283–84.

In 1938, this Court was asked to determine whether a writ of mandamus commanding a justice of the peace to vacate his

office should issue. *Kimble v. Bender,* 173 Md. 608, 196 A. 409 (1938). We concluded that, pursuant to Article 3, Section 17 of the Maryland Constitution,[7] Kimble was ineligible for appointment to the office of justice of the peace because he had been a member of the State Senate when the legislation creating the office was enacted. Accordingly, this Court affirmed the trial court's issuance of the writ. *Id.* at 622, 196 A. at 415. Nevertheless, the Court addressed the validity of Kimble's official actions while acting as a justice of the peace:

> "The appointment of an ineligible person is a nullity, except that the official acts of such a person are regarded as the acts of an officer *de facto.* So the official acts of the ineligible respondent, who has acted as a justice of the peace at large under a valid act but under an invalid appointment, are the acts of a *de facto* officer, whose official acts, if otherwise lawful, and until the respondent's title is adjudged insufficient, are as valid and effectual, where they concern the public or the rights of third persons, as though he were an officer *de jure. State v. Fahey,* 108 Md. 533, 538, 539, 70 A. 218[, 220 (1908) ]; *Koontz v. Burgess ad Commrs. of Hancock,* 64 Md. 134, 136, 20 A. 1039 [ (1885) ]; *Izer v. State,* 77 Md. 110, 115, 26 A. 282[, 283 (1893) ]; *Claude v. Wayson,* 118 Md. 477, 84 A. 562. [ (1912) ]."

Id. at 622–23, 196 A. at 415–16.[8] *See also, Hendershott v. Young,* 209 Md. 257, 260–61, 120 A.2d 915, 916–17 (1956), in which this Court observed:

---

**7.** Section 17 of Article 3 of the Constitution of Maryland provides: "No Senator or Delegate, after qualifying as such, notwithstanding he may thereafter resign, shall during the whole period of time for which he was elected, be eligible to any office, which shall have been created, or the salary, or profits of which shall have been increased, during such term."

**8.** The resolution of the issue in *Kimble v. Bender,* 173 Md. 608, 196 A. 409 (1938) required the Court to review a number of statutes and statutory provisions, which the Court determined to be "defective on constitutional grounds." *Id.* at 623, 196 A. at 416. Recognizing, therefore, "that throughout an extended period, immediately preceding the statute [at issue in the case], a number of justices of the peace discharged the duties of that office in Allegany County under purporting

"Open to very serious doubt is whether petitioner could challenge by *habeas corpus* the authority of the justice of the peace to act since he acted under color of title to a constitutional office and no court had declared that he was not legally able to do so, under the provisions of Chap. 321, § 5 of the Acts of 1927, codified as § 598 of the Code of Public Laws of Montgomery County (Flack, 1947), or otherwise. There are many decisions by able courts, holding that *habeas corpus* will not issue to challenge the effect or results of the action of a *de facto* judicial officer, including a justice of the peace. It may well be that the committing magistrate, who acted in the case before us, if not a *de jure*

---

statutory authority which failed on constitutional grounds to authorize the appointments," *id.,* the Court looked at the effect of these unconstitutional statutes on the acts of those appointed pursuant to them. It concluded:

"Thus it happened that, throughout the entire period mentioned, the constitutional office of justice of the peace subsisted, but appointments of justices to fill the position were made under the wrong statutes. The unconstitutional statutes, however, were accepted by the public authorities as valid. The various governors of the State during this period, by and with the advice of the Senate, appointed, pursuant to the terms of the unconstitutional terms of the laws, the number of justices of the peace specified, from time to time, and sent them their commissions, whereupon the several justices of the peace so selected and commissioned qualified in the usual manner and took the oath prescribed, and entered upon and discharged the duties and office of justice of the peace for Allegany County according to the tenor of the statutes currently assumed to be in force. The judgments thus rendered are not subject to collateral attack, and their validity may be sustained upon the theory that the justices so appointed were *de facto* justices. *Supra.*"

*Id.* at 623–24, 196 A. at 416. Acknowledging the conflict with the position taken by the United States Supreme Court in *Norton v. Shelby County, supra,* the Court adopted the rule that, "although there is no *de jure* office, because the statute which provides for it is unconstitutional, there may be a *de facto* officer until the unconstitutionality of the act has been judicially determined." *Id.* at 625, 196 A. at 417. The distinction this court discerned was that, in *Norton,* "the unconstitutional act proposed to create an office which had not theretofore formed a part of the governmental scheme and was an anomaly in the administrative system of county affairs in the State of Tennessee," *id.,* while, in Maryland, the office of justice of the peace is constitutional, of ancient origin and customary usage, predating the passage of the various statutes determined to be unconstitutional. *Id.* at 626, 196 A. at 417.

officer—as to which we express no opinion—was, at least, a *de facto* officer. Constitution of Maryland, Art. 4, § 42." *Id. See also Quenstedt v. Wilson,* 173 Md. 11, 14–21, 194 A. 354, 355–59 (1937) (habeas corpus relief proper where "police justice" was validly appointed, but the new court created by the Legislature was unconstitutional).

In *Ralph v. Brough,* 248 F.Supp. 334 (D.Md.1965), the United States District Court for the District of Maryland recognized the *de facto* officer doctrine in the context of a Maryland Death penalty case. There, the petitioner, Ralph challenged the authority of his trial court on the basis that the jurors and judges had been required to declare a belief in God when they took their required oaths in contravention of *Schowgurow v. State,* 240 Md. 121, 213 A.2d 475 (1965), and *State v. Madison,* 240 Md. 265, 213 A.2d 880 (1965). Following *Smith v. Brough,* 248 F.Supp. 435 (D.Md.1965), the court held that refusal to apply *Schowgurow* and *Madison* "retroactively, except for convictions which had not become final before the rendition of the *Schowgurow* opinion, did not violate any provision of the Fourteenth Amendment or any other provision of the Federal Constitution," *id.* at 335, and that the judges were *de jure* judges. *Id.* at 336. The court went on to say that even if the oath raised questions as to the judges' qualifications, the judges were nonetheless *de facto* judges.

"Even if they were not *de jure* judges, they met all the tests of *de facto* judges. The general rule with respect to the validity of the official acts of *de facto* judges is set out in. 30A Am.Jur., Judges, § 234, as follows: 'It is the general rule that acts performed by a *de facto* judge are not invalid. A judge *de facto* is, to all intents and purposes, a judge *de jure* as to all persons except the state. Thus, the official acts of a *de facto* judge are just as valid for all purposes as those of a *de jure* judge, so far as the public or third persons who are interested therein are concerned, and their validity may not be collaterally attacked.' In *McDowell v. United States,* 159 U.S. 596, 16 S.Ct. 111, 112, 40 L.Ed. 271 (1895), the Supreme Court stated: 'Judge Seymour must be

held to have been a judge *de facto*, if not a judge *de jure*, and his actions as such, so far as they affect third persons, are not open to question.' "

*Id.* at 336. (Some citations omitted).

Courts in other States that have addressed the issue have reached similar results. *See e.g., Gates v. City of Tenakee Springs*, 954 P.2d 1035, 1038–1039 (Alaska 1998) (*de facto* doctrine applies even when judge no longer a resident of State, a statutory requirement for Alaska judges); *People v. Owers*, 29 Colo. 535, 69 P. 515, 519 (1902) (although residency requirement is mandatory, judge should be removed from office only upon "substantial misconduct on his part"); *State v. Carroll*, 38 Conn. 449, 455 (1871) (where judge lawfully appointed becomes unqualified, "the defect, if it be one, is a defect of *qualification* in the officer, by reason of an omission of his, or of the clerk, and is not of a character to prevent his acts from being valid as the acts of an officer *de facto*, whether the law under which he was called in was constitutional or not."); *State v. Whelan*, 103 Idaho 651, 651 P.2d 916, 920 (1982) ("A *de facto* officer performs his duties under color of right of an actual officer qualified in law so to act, both being distinguished from the mere usurper who has neither lawful title nor color of right."); *Cleary v. Chicago Title and Trust Company*, 4 Ill.2d 57, 122 N.E.2d 227, 228 (1954) *cert. denied* 348 U.S. 972, 75 S.Ct. 534, 99 L.Ed. 757 (1955) (appointment of appellate court judges may not be attacked in collateral proceeding; appointment confers a color of office, and the judgments rendered thereunder are valid); *Hovanec v. Diaz*, 272 Ind. 342, 397 N.E.2d 1249, 1250 (1979) (to be *de facto* officer, must claim the office, be in possession and perform duties under color of election); *State v. Roberts*, 130 Kan. 754, 288 P. 761, 762 (1930) (" 'The acts of an officer *de facto* are as valid and effectual where they concern the public or rights of third persons, until his title to the office is judged insufficient, as though he were an officer *de jure*, and the legality of the acts of such an officer cannot be collaterally attacked in a proceeding to which he is not a party.' "); *Martin v. Stumbo*, 282 Ky. 793, 140 S.W.2d 405, 407 (1940) ("his [*de facto* judge's] acts . . .

are not void but valid and binding"); *Brown v. Lunt,* 37 Me. 423, 432 (1854) (noting that justice of the peace "acting with color of title, though holding over the time limited by his commission, and without legal authority" was *de facto* officer); *Crocker v. Sears, Roebuck and Company,* 346 So.2d 921, 922–23 (Miss.1977) (acts of a *de facto* judge are valid, whether properly appointed or qualified or not); *Brinkerhoff-Faris Trust Sav. Co. v. Gaskill,* 356 Mo. 61, 201 S.W.2d 274, 276 (1947) ("... Judge Bruce was a judge *de facto* because as a special judge of a court of general jurisdiction he purported to act under color of the authority of a known appointment, made of record, actually exercising the judicial functions he assumed, even though there was in fact an irregularity in his appointment, and he apparently held such office as special judge with the irregularity of his appointment unknown to the public...."); *State v. Kidder,* 169 Neb. 181, 98 N.W.2d 800, 802 (1959) ("Where a person is appointed by the proper authority as acting county judge and thereafter performs the duties of the office and holds himself out to the public as such officer, but has failed to give the required statutory bond or take the required statutory oath of office, such person is a county judge *de facto.* The acts and judgment of a *de facto* officer are as valid and binding as though performed and rendered by an officer whose title was beyond dispute."); *State v. Barnard,* 67 N.H. 222, 29 A. 410, 411 (N.H.1892) (official title is not triable collaterally); *Sylvia Lake Co. v. Northern Ore Company,* 242 N.Y. 144, 151 N.E. 158, 159 (1926) ("Whatever may be said of his assuming to act after he became seventy years of age, he was, at least as far as third parties are concerned, a *de facto* justice"); *In re Wingler,* 231 N.C. 560, 58 S.E.2d 372, 375 (1950) ("A judge *de facto* may be defined as one who occupies a judicial office under some color of right, and for the time being performs its duties with public acquiescence, though having no right in fact."); *Huffman v. Huffman,* 2002 Ohio 6031, P44–45 (2002) (retired judge is *de facto* judge even though the referral pursuant to which he acted was an erroneous exercise of jurisdiction); *Corporation Funding & Finance Co. v. Stoffregen,* 264 Pa. 215, 219, 107 A.

727 (1919) ("The court had jurisdiction of the parties and the subject-matter and the judge was acting pursuant to a statutory authority and was at least a *de facto* judge, whose acts are valid without reference to the constitutionality of the statute...."); *State v. Smejkal,* 395 N.W.2d 588, 591–592 (S.D. 1986) ("A *de facto* officer is one who is surrounded with the insignia of office and seems to act with authority.... Their title is not good in law, but they are in fact in the unobstructed position of an office and discharging its duties in full view of the public, in such manner and under such circumstances as not to present the appearance of being an intruder or usurper."); *Ridout v. State,* 161 Tenn. 248, 30 S.W.2d 255, 259 (1930) (quoting *Blackburn v. State,* 3 Head 690, [40 Tenn. 690 (1859)] ) (where person elected judge sits beyond the term of court in which elected, official acts are not collaterally challengeable—" 'He may be removed from the office, and his powers terminated by the proper proceedings, but until that is done, his acts are binding.' "). *See State v. Biggers,* 911 S.W.2d 715, 718 (Tenn.1995) (judgment rendered by the judge who was elected to a term less than eight years as is constitutionally required was *de facto* judge); *State v. Britton,* 27 Wash.2d 336, 178 P.2d 341, 346 (1947) (rejecting the defendant's challenge to the temporary judge procedure, the court observed: "Judge Hill was in possession of the office by virtue of his appointment by the governor. He was not a mere usurper or interloper undertaking to act without any color of right. He was a *de facto* judge.").

The *de facto* officer doctrine has been applied to validate acknowledgments required to be taken by a judge that were made after the expiration of the judicial term of the judge taking it, *Brown v. Lunt, supra,* 37 Me. at 432; to a judge sitting beyond the term in which elected, *Ridout v. State, supra,* 30 S.W.2d at 262–63; to a judge continuing to sit past retirement age, *Sylvia Lake Co. v. Northern Ore Company, supra,* 151 N.E. at 159; *but see, In Re Pittman,* 151 N.C.App. 112, 564 S.E.2d 899, 901 (2002) (concluding that judge who signed a court order one and one half months after her defeat in a judicial election was an usurper); the appointment of

person without the proper qualifications for the position, *State v. Smith,* 52 Wash.App. 27, 756 P.2d 1335, 1336–37 (1988) (appointment of lay person as a judicial officer to issue search warrant when statute required an attorney); *Duncan v. Beach,* 294 N.C. 713, 242 S.E.2d 796, 800–01 (1978) (election of a person disqualified by reason of age to the office of judge); and, to a warrant signed by a lay magistrate prior to receiving certificate of authorization. *State v. Smejkal, supra.*

Some of the cases have involved factual patterns quite similar to those of the case *sub judice.* In *Hovanec v. Diaz,* 272 Ind. 342, 397 N.E.2d 1249 (1979), Hovenac, a resident of Lake Station City, was re-elected as city judge in Lake Station City. While in office, however, he moved from Lake Station City to Crown Point, an adjoining township. His authority to continue as a Lake Station City judge was challenged by Diaz, who, having discovered, during an unrelated habeas corpus proceeding, that Hovanec had moved, filed a *quo warranto* proceeding to declare the seat vacant as of the date Hovanec moved. The Indiana court rejected the challenge. On the issue of Hovanec's status, it reasoned:

> " '[W]e note that Judge Hovanec has acted as a *de facto* officer. 'All that is required to make officers *de facto* is that they are claiming the office and in possession of it, performing its duties and claiming under color of election. *Rule, supra,* 207 Ind. at 552, 194 N.E. at 153.' In *Parker et al. v. State ex rel. Powell* (1892) 133 Ind. 178, 200, 32 N.E. 836, 843, this Court stated:
>
> > 'The rule that the acts of an officer *de facto,* performed before ouster, are, as valid as the acts of an officer de jure, is too familiar to the profession to need the citation of authority.' "

*Id.,* 397 N.E.2d at 1250.

Similarly, the judge in *Crocker v. Sears, Roebuck and Company, supra,* 346 So.2d 921 (Miss.1977), was alleged to reside outside the district in which he was sitting. As in *Hovanec v. Diaz,* the Mississippi Supreme Court, citing the *de facto* officer doctrine, refused to entertain a challenge to the judge's authority, pointing out: " 'the acts of a *de facto* judge

are valid, regardless of whether he was properly ... qualified or not, and we deem it unnecessary to pass upon the question as to whether the judge should have been appointed from the resident attorneys of the district.'" *Id.* at 922–23 (*quoting Bird v. State*, 154 Miss. 493, 122 So. 539, 540, (1929)).

*Gates v. City of Tenakee Springs, supra,* 954 P.2d 1035, (Alaska, 1998) is an even more extreme case than the instant one is alleged to be. There, the judge whose judicial authority was at issue was retired and had been residing out of state for three years when he signed the order that was at the center of the challenge. Neither the fact of his retirement nor his out-of-state residence prevented the application of the *de facto* officer doctrine. Having initially noted that residency in Alaska was a statutory requirement for Alaska judges, the Supreme Court of Alaska opined:

"But Gates is mistaken that the fact that Judge Schulz may have been a California resident entitles her to relitigate her medical emergency claims. Neither AS 22.10.090 nor any other Alaska statute or case indicates that Gates is entitled to such relief. Authority in other jurisdictions holds that an acting judge (such as Judge Schulz) who has colorable authority due to his or her appointment is a *de facto* officer whose acts are legally valid and binding on the public and on third persons if done within the scope and by the apparent authority of his or her office, even though the judge's actual authority suffers from a procedural defect....

"We perceive no compelling reason to deviate from the approach of these courts and to engraft the remedy Gates requests.... Requiring relitigation of matters decided by a competent, unbiased judge who, except for the matter of residency, was duly appointed is a poor use of valuable judicial and private resources.... Furthermore, the *de facto* judge doctrine protects third parties and the public in their dealings with the judicial system."

*Id.* at 1038–39. (Citations omitted.).

In addition to stating the *de facto* officer rule, the cases have emphasized the necessity of raising the issue of a defect

in the officer's qualifications in the proper proceeding.[9] Many of these cases identify a *quo warranto* action, "a proceeding that deals mainly with the right of the incumbent officer and does not determine the rights of any adverse claimant," *Hovanec v. Diaz, supra,* 397 N.E.2d at 1250, as the "proper proceeding."[10] *See e.g., Turner v. Evansville,* 740 N.E.2d 860, 862 n. 2 (Ind.2001) (proper way to challenge authority of an office is by filing a *quo warranto* action); *Hovanec v. Diaz, supra,* 397 N.E.2d at 1250 ("Historically, *quo warranto* is the proper remedy to determine the right to an office."); *Brown v. Lunt, supra,* 37 Me. at 430 (noting that "the trustees of a

---

**9.** Although it recognizes the *de facto* officer doctrine in the context of judicial decision-making, New Jersey applies a somewhat different analysis in such cases, requiring that the issue of the judge's authority to act be raised by the party challenging it in the court in which the judge whose authority is being challenged presided. *See State v. Pillo,* 15 N.J. 99, 104 A.2d 50, (1954); *State v. Sagarese,* 34 N.J.Super. 126, 111 A.2d 777, 779 (1955). *But see State v. Town of Dover,* 62 N.J.L. 138, 41 A. 98, 98–99 (1898), where the court said:

> "No private citizen can challenge the legal existence of organized municipal government. It can be successfully assailed only by the attorney-general. Until he intervenes to controvert its authority, and until he institutes proceedings by which it is overturned and suppressed, it is *de facto,* and the public functions with which it is charged, within the scope of its apparent powers, may be lawfully exercised by its officials as *de facto* officers.
>
> "In our judgment, such a government must prevail and be respected until the attorney-general intervenes by *quo warranto* and, through judicial action, secures the actual ouster and removal of the incumbents in office."

**10.** Whether, in this State, *quo warranto* is an appropriate proceeding is far from clear. In *Hawkins v. State of Maryland,* 81 Md. 306, 311, 32 A. 278, 279 (1895), this Court, holding that the State's Attorney had no legal authority to institute *quo warranto* proceedings seeking to oust a county commissioner from office, suggested that the remedy was available only with legislative authorization: "And the fact that special provision was made by the Act of 1856, ch. 16 (Code Art. 69, sections 4 and 5), although apparently never availed of for proceeding by *quo warranto,* for the purpose of ousting defaulters from office, would seem to indicate that the power to institute such proceedings against persons holding office without authority of law did not exist, or at least was not supposed to exist outside of and independent of the statute." *See also Harwood v. Marshall,* 9 Md. 83, 106 (1856) (holding mandamus to be appropriate remedy for a party who claims title to an office, and asks

village, holding over beyond the term for which they were elected, by their own neglect, were liable to be ousted on *quo warranto* . . ."); *State v. Barnard, supra,* 29 A. at 411 (colorable title may not be attacked except in appropriate action brought to establish legal title and in which the *de facto* officer is a party, mentioning *quo warranto* action); *People v. Bowen,* 231 Cal.App.3d 783, 789, 283 Cal.Rptr. 35, 39 (1991) ("the proper method of challenging the right of a judge to hold office is by a quo warranto proceeding"); *State v. Smith, supra,* 756 P.2d at 1337. *See Bird v. State,* 154 Miss. 493, 122 So. 539, 540 (1929) (noting that right to question a judge's entitlement to hold the office is for the state to raise in appropriate proceeding). *Relative Value Studies, Inc. v. McGraw–Hill, Co.,* 981 P.2d 687, 688 (Colo.App.1999).

At issue in *Relative Value Studies, Inc. v. McGraw–Hill, Co.,* 981 P.2d 687 (Colo.App.1999), was the propriety of the trial judge's grant of summary judgment in a contract case, when, prior to the entry of summary judgment, the trial judge had moved his personal residence outside of the judicial district in which he had been elected, in violation of the Colorado Constitution. *Id.* at 688. The intermediate appellate court summarily disposed of the plaintiff's arguments that the order should be voided on that account. Acknowledging that the constitutional prescriptions were mandatory upon judges of Colorado, but relying on the Colorado Supreme Court's decision in *People v. Owers, supra,* 29 Colo. 535, 69 P. 515, 519 (1902), the court in *Relative Value Studies* noted that the proper procedure for removing a sitting judge is through a *quo warranto* proceeding. It explained:

"In the only Colorado appellate case construing Colo. Const. art. VI, 11, the supreme court declined to remove a judge from office despite the fact that his principal residence was outside the district in which he was elected and was acting as judge. Although conceding that the constitutional residence requirement was mandatory, the supreme court there

for the removal of the occupant and rejecting the argument that *quo warranto* was another legal remedy).

concluded, in a quo warranto action, that absent some 'substantial misconduct upon his part,' the judge should not be removed from office. *People v. Owers*, 29 Colo. 535, 550, 69 P. 515, 519 (1902).

"While that case does not directly answer the question before us, it logically dictates the result: a properly appointed judge, despite even a conceded violation of the constitutional residency requirement, does not lose his or her authority to act as judge merely because of the violation." *Id.*

Similarly, in *People v. Bowen, supra* a criminal defendant learned subsequent to his trial that the judge, who presided at that trial, had violated the statutory residence requirement. He challenged the authority of the judge to act and to hold the office. The court concluded that the challenge lacked merit. Its reasoning turned, in part, on the fact that the defendant did not raise the defect in the trial judge's residency in the proper proceeding. In that regard, the court stated:

"Since 1866 our courts have held the proper method of challenging the right of a judge to hold office is by a quo warranto proceeding. In *People v. Sassovich* (1866) 29 Cal. 480, a murder case in which the death penalty was imposed, on appeal the defendant challenged his trial proceedings as void because the court in which he was tried was unconstitutionally created by the Legislature and the governor lacked the constitutional power to appoint the judge who presided over defendant's trial and conviction. After finding the court was constitutionally created, the court rejected the second contention, holding: 'The person who filled the office of Judge at the time this case was tried was appointed and commissioned by the Governor under and in pursuance of the provisions of the Act in question. He entered therefore under color of right and title to the office, and became Judge *de facto* if not *de jure,* and his title to the office cannot be questioned in this collateral mode. His title can only be questioned in an action brought directly for that purpose....' A contrary doctrine, for obvious reasons, would lead to most pernicious results." (29 Cal. at 485.).

As between defendant and the People in this proceeding, the issue is collateral.

*Bowen,* 231 Cal.App.3d at 789, 283 Cal.Rptr. at 39.

In the case *sub judice,* there is no contention that Judge Whitfill was a usurper or took office pursuant to a fraudulent or invalid appointment or election. Indeed, it is conceded that, when Judge Whitfill was appointed and subsequently elected, he was, for all purposes, a duly qualified judge, a *de jure* judge, of the Circuit Court for Harford County. Assuming, arguendo that during his term as judge, Judge Whitfill changed his residence from Harford County to Baltimore County and maintained that residence outside Harford County for a period of time, it is clear that, during all of that period, he continued to occupy the office of Circuit Court Judge in Harford County, discharging throughout the period, and for all times thereafter, the duties of the office. And he did so openly and notoriously. Nor was or has, Judge Whitfill been removed pursuant to any constitutional, statutory or common law remedy. The appellant has not cited any cases, and we have not discovered any, that support the petitioner's argument that Judge Whitfill lost his judicial authority by operation of law upon his change of residence. It follows that even if, by virtue of a change of residence, Judge Whitfill ceased to be a *de jure* judge, he was, until his retirement,[11] at the very least a *de facto* judge for the period relevant to this case. As such, his actions "are as valid and effectual where they concern the public or rights of third persons, until his title to the office is judged insufficient, as though he were an officer *de jure* ..." *State v. Roberts, supra,* 288 P. at 762. To be sure, this applies to the petitioner, who is a third person in the case at hand.

Furthermore, the legality of the acts of a *de facto* judge, or that judge's entitlement to the office, may not be

---

**11.** Since retirement, Judge Whitfill has been certified by this Court for recall to sit, by special designation, in the Third Circuit, which consists of the Circuit Court for Harford County and the Circuit Court for Baltimore County.

collaterally attacked in a proceeding to which the *de facto* judge is not a party. *Id.* In this case, we have seen, the petitioner moved to quash or strike both an illegal sentence and the warrant of execution. This is a collateral attack on the petitioner's sentence. It is not a proceeding brought directly to question whether Judge Whitfill was validly holding the office of judge of the Circuit Court for Harford County when he sentenced the petitioner and signed the Warrant of Execution.

JUDGMENT AFFIRMED, WITH COSTS.