Joni GATES, Appellant,

v.

CITY OF TENAKEE SPRINGS, Appellee.

No. S–7257.

Supreme Court of Alaska.

March 13, 1998.

Joni Gates, pro se, Petersburg.

William T. Council, Council & Sanders, Juneau, for Appellee.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

PER CURIAM.

I. *INTRODUCTION*

Joni Gates appeals the superior court's order on remand denying her motion for relief from judgment. We affirm.

## II. FACTS AND PROCEEDINGS

This is the third time that this case has come before this court. The following facts are taken from *Gates v. City of Tenakee Springs,* Mem. Op. & J. No. 0744 (Alaska, October 26, 1994) (*Gates II* ):

In *Gates v. City of Tenakee Springs,* 822 P.2d 455 (Alaska 1991), Gates claimed, inter alia, that the City of Tenakee Springs negligently removed a fence, resulting in damage to her property. The trial court granted summary judgment in favor of Tenakee Springs. One basis for the trial court's decision was that Tenakee Springs had municipal immunity from Gates' claims. *Id.* at 457. We held that Tenakee Springs' decision to remove the fence was protected, but that the manner in which the fence was removed was not immune. Therefore, if negligent removal caused Gates' damages, she should be compensated. The case was remanded to determine whether Gates' alleged damages were the result of negligent removal of the fence. *Id.* at 459. Additionally, the trial court was to determine the extent of the damage caused by the method Tenakee Springs selected to remove the fence. *Id.*

The trial on remand was rescheduled to take place in Juneau at 9:30 a.m. on October 30, 1992. Gates failed to appear. She did not contact the clerk of court's office, the assigned judge's chambers, the opposing party or its attorney. Tenakee Springs moved ex parte for and was granted entry of judgment by default under Alaska Civil Rule 55(c)(1).

On November 4, 1992, Gates moved to reschedule the trial. She claimed she was unable to attend the October 30 trial because of a medical emergency. Gates explained that she had an appointment in Juneau with Dr. Nell Wagoner on October 29, 1992, for a medical examination. She had scheduled the examination for the same week as the trial to save making an extra trip to Juneau. After examining Gates, Dr. Wagoner scheduled some tests for Gates at Bartlett Hospital. One test required the injection of an IVP anti-allergenic contrast agent—a dye to which Gates is allegedly allergic. This test was administered at 8:39 a.m., on the morning Gates' trial was to take place. Gates claims that

Dr. Wagoner prescribed some medication for her to take before the test because of her allergy. Gates claims that the doctor "assured [her] that the medicine would work," but that she "was concerned about [her] having enough time to take all of the medicine before the kidney test." Although Gates had not completed taking all of the medication, she had the test done on October 30. Gates did not suffer an immediate reaction to the IVP dye. However, she claims that thirty to forty-five minutes after the injection of the dye and after her test was completed, she got hives and became a "little breathless." She asserts that she then realized that she would be unable to "physically and mentally function at the scheduled remand hearing in about half an hour." She did not contact the court at that time.

According to the affidavit of Albert Lodovici, the radiologic technologist who administered the IVP dye to Gates, the x-ray procedure that followed the injection of the dye took approximately twenty-five minutes. During the test, Gates manifested no adverse reactions. Additionally, the affidavit of Dr. Gordon T. Blair, a radiologist, stated that significant reactions to IVP dye typically occur within a few minutes after injection and that it would be "extremely unusual for there to be no significant reaction initially, and then to have a significant reaction occur later." He further noted that Gates' records would have indicated such a reaction if one had occurred.

*Id.* at 1–4 (footnotes omitted) (alterations in original). The superior court treated Gates's motion to reschedule the trial as a motion to set aside judgment under Alaska Civil Rule 60(b). *Id.* at 4. The court denied the motion without making any findings on whether Gates experienced a medical emergency. *Id.* at 4, 7.

In *Gates II,* we held that "a party's failure to appear at a scheduled proceeding because of a medical emergency can be considered excusable neglect under Civil Rule 60(b)(1), if in fact the party had a medical emergency." *Id.* at 6. We declined to review the superior court's denial of Gates's motion because the

superior court failed to enter findings. *Id.* at 7. It was unclear to us whether the superior court's denial of Gates's motion "meant that Gates failed to submit enough evidence supporting the fact that she had a medical emergency, or whether in light of the evidence submitted by Tenakee Springs, the court meant that it did not believe Gates' version of the events." *Id.* We remanded the case "for entry of findings of fact supporting the trial court's conclusion." *Id.*

On remand the superior court made the following findings:

> [Gates's] affidavit of December 4, 1992, states that she had an appointment with Dr. Jones in October, 1992. Dr. Jones denies that she ever had such an appointment with [Gates], indeed that there was ever a doctor-patient relationship with [Gates]. [Gates's] affidavit further states that her appointment with Dr. [Wagoner] was for the week of October 30th but there is no indication that the appointment interfered with [Gates's] scheduled court appearance on October 30. The only possible support for [Gates's] failure to appear on October 30 was her statement that she had an adverse reaction to the kidney test and, "I had hives and respiratory problems and was prostrate for a day and a half."
>
> Since [the City of Tenakee Springs'] affidavits remained uncontroverted on April 19, 1993, this court denied [Gates's] motion. Her affidavit dated December 4, 1992, simply fails to persuade this court that there was a medical emergency on October 30, 1992, that would in any way have prevented her appearance in court and participation in the proceedings scheduled for that date. [Gates] never ad-

dressed Dr. Blair's affidavit, or Albert Lodovici's affidavit, though she had nearly a month to do so before this court ruled.

On the basis of these findings, the court again denied Gates's motion. The order entering the findings and denying the motion was signed on March 2, 1995, by Judge Thomas Jahnke "at [the] direction [of] Thomas E. Schulz/Superior Court Judge *Retired.*" This appeal followed.

### III. *DISCUSSION*

Gates's primary argument on this appeal is that Judge Schulz lacked the authority to enter findings on remand because he "had been a resident of California for three years." According to Gates, because Judge Schulz lacked authority to enter findings on remand, his findings must be set aside and Gates is entitled to a new hearing on the issue of whether she suffered a medical emergency on October 30, 1992.

 Before considering this argument, we note that, apart from the residency question, entry of the order and findings of March 2, 1995, was appropriate. Judge Schulz was properly appointed superior court judge pro tempore by Special Order of Chief Justice Daniel A. Moore.[1] Judge Schulz had the authority under this order to enter findings on remand clarifying his denial of Gates's motion,[2] and Judge Jahnke could properly endorse those findings at his predecessor's direction.[3] Moreover, since Gates's claim that she was entitled to relief from judgment was based entirely on her medical emergency argument, *see Gates II* at 5–6, the court did not abuse its discretion by denying Gates's motion for relief from judg-

---

1. Alaska Supreme Court Order No. 3043 (December 21, 1992). The Alaska Constitution provides that retired judges "shall render no further service on the bench except for special assignments as provided by court rule." Alaska Const. art. IV, § 11. Alaska Administrative Rule 23(a) authorizes the chief justice to appoint a retired superior court judge to sit pro tempore "where such assignment is deemed necessary for the efficient administration of justice." Pro tempore appointments "may be made for one or more cases or for a specified period of time up to two years, except that a pro tempore judge or justice may complete a trial or appeal in progress at the time of the conclusion of the appointment." *Id.*

2. The appointment term ran from January 4, 1993 through March 31, 1993, continuing "through any additional time necessary to reasonably complete" any assigned matters. Alaska Supreme Court Order No. 3043 (December 21, 1992); *see also* Alaska R. Admin. P. 23(a).

3. *See* Alaska R. Civ. P. 63(c); *Pollastrine v. Severance*, 375 P.2d 528, 530 (Alaska 1962) ("The two oral opinions of the trial judge are comprehensive and yet particularized to a degree sufficient to indicate the factual basis for the trial judge's ultimate conclusion.... [Therefore] it is concluded that the successor superior court judge had authority to file the April 18, 1961 decree in this cause.").

ment under Civil Rule 60(b). The superior court's finding that Gates was not prevented from appearing in court by a medical emergency is supported by the affidavits of Dr. Blair, Dr. Jones, Albert Lodovici, and others, *see Gates II* at 2–4, and Gates failed to present any evidence to refute these affidavits, or to otherwise support her claim of medical emergency.

■ Against this backdrop, we proceed to consider Gates's argument that Judge Schulz lacked authority to enter findings, in response to our remand in *Gates II,* because he "ha[d] been a resident of California for three years." [4]

Gates is correct that, assuming Judge Schulz "ha[d] been a resident of California for three years," it was inappropriate for him to serve as a pro tempore judge.[5] Alaska Statute 22.10.090 provides that "[a] judge of the superior court shall be a citizen of the United States and of the state, a resident of the state for five years immediately preceding appointment . . . ."

■ But Gates is mistaken that the fact that Judge Schulz may have been a California resident entitles her to relitigate her medical emergency claims. Neither AS 22.10.090 nor any other Alaska statute or case indicates that Gates is entitled to such relief. Authority in other jurisdictions holds that an acting judge (such as Judge Schulz) who has colorable authority due to his or her appointment is a de facto officer whose acts are legally valid and binding on the public and on third persons if done within the scope and by the apparent authority of his or her office, even though the judge's actual authority suffers from a procedural defect. *See, e.g.,* Am.Jur.2d *Judges* § 242 (1994) (stating that the de facto judge doctrine has been

uniformly applied throughout the country to prevent collateral attacks based on a procedural defect in the judge's authority); *People v. Bowen,* 231 Cal.App.3d 783, 283 Cal.Rptr. 35, 39 (1991) (applying the doctrine to preclude a criminal defendant from collaterally attacking the superior court judge's authority to try him where the judge did not meet county residency requirement); *Humel v. Hoogendorn,* 5 Alaska 25, 25 (Alaska 1914) (recognizing that judge who continued to function after end of term was a de facto judge whose actions could not be collaterally attacked).

We perceive no compelling reason to deviate from the approach of these courts and to engraft the remedy that Gates requests onto AS 22.10.090. Requiring relitigation of matters decided by a competent, unbiased judge who, except for the matter of residency, was duly appointed is a poor use of valuable judicial and private resources. *Cf. United States v. James Daniel Good Real Property,* 510 U.S. 43, 64, 114 S.Ct. 492, 506, 126 L.Ed.2d 490 (1993) ("[T]here is no presumption or general rule that for every duty imposed upon the court or the Government and its prosecutors there must exist some corollary punitive sanction for departures or omissions, even if negligent.") (quoting *United States v. Montalvo–Murillo,* 495 U.S. 711, 717, 110 S.Ct. 2072, 2077, 109 L.Ed.2d 720 (1990)). In addition, procedural defects in a judge's qualifications do not affect the fairness of the proceedings. *See Bowen,* 283 Cal.Rptr. at 39 (stating that the issue of whether the judge met county residency requirement was "wholly removed from the question of [the defendant's] guilt or innocence or the fairness of the trial.").[6] Furthermore, the de facto judge doctrine pro-

---

**4.** At the request of this court, the parties briefed the issue of whether, assuming that Judge Schulz failed to meet the state residency requirement, he still had authority to enter the findings on remand pursuant to the de facto judge doctrine.

**5.** It was inappropriate for Judge Schulz to serve as a pro tempore judge if he was a California resident either at the time of his initial appointment or at the time he entered his *Gates II* findings on remand.

**6.** We reject Gates's argument that a violation of a state residency requirement is a substantive in-

stead of a procedural defect. Several cases have applied the de facto judge doctrine to judges who fail to meet residency requirements. *See, e.g., Bowen,* 283 Cal.Rptr. at 39 (applying doctrine where judge failed to meet county residency requirement); *Hovanec v. Diaz,* 272 Ind. 342, 397 N.E.2d 1249, 1250 (1979) (applying doctrine where judge failed to meet city residency requirement). In addition, residency requirements, whether state, county, or city, are procedural requirements that do not affect the fairness of the trial.

tects third parties and the public in their dealings with the judicial system. *See, e.g., Farm Bureau Policyholders & Members v. Farm Bureau Mut. Ins. Co.,* 330 Ark. 350, 952 S.W.2d 675, 676 (1997).

■ Gates argues that the de facto judge doctrine does not apply to pro tempore judges. However, several cases have held that the doctrine applies to judges pro tempore. *See, e.g., Survance v. State,* 465 N.E.2d 1076, 1081–82 (Ind.1984); *Giles v. State ex rel. Giles,* 191 Tenn. 538, 235 S.W.2d 24, 29 (1950); *Mattingly v. Commonwealth,* 310 Ky. 561, 221 S.W.2d 82, 84 (1949). We agree with these cases, because the policy considerations previously discussed apply with equal force to judges pro tempore. In addition, just as with regularly appointed judges, judges pro tempore act under color of authority. *See State v. Hill,* 17 Wash.App. 678, 564 P.2d 841, 843 n. 1 (1977) (holding that where a judge pro tempore is in actual possession of the office and discharging its duties, he or she acts under color of title and is a judge de facto); *see also Pickens v. Johnson,* 42 Cal.2d 399, 267 P.2d 801, 805, 808 (1954) (holding that the appointment of a pro tempore judge "vest[s] in [him or her] the powers of a judge of the [ ] court during the period specified in the assignment.").

■ Here, Judge Schulz was appointed as a judge pro tempore for a specific period of time and to a particular office, so he was acting under color of authority in a de jure office. We thus hold that even if he failed to meet the state residency requirement, he was a de facto judge, and had authority to enter the findings on remand.

IV. *CONCLUSION*

The order on remand is AFFIRMED.