**Greg VROMAN, Appellant,**

v.

**CITY OF SOLDOTNA, Soldotna Police Department, Appellee.**

No. S–11387.

Supreme Court of Alaska.

April 29, 2005.

---

Arthur S. Robinson, Robinson & Associates, Soldotna, for Appellant.

Howard S. Trickey and Matthew Singer, Jermain Dunnagan & Owens, P.C., Anchorage, for Appellee City of Soldotna.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Greg Vroman was fired from his job with the Soldotna Police Department. He now seeks to vacate an arbitration decision affirming his termination, arguing that the City of Soldotna did not properly select its arbitrator. Because the *de facto* officer doctrine conferred validity on the arbitration even if the arbitrator had not been properly

**1.** SMC 2.28.050(D)(5).

selected, we affirm the decision of the superior court.

## II. FACTS AND PROCEEDINGS

Greg Vroman was a police officer with the Soldotna Police Department. In September 1999 he shot a lynx out of season and failed to report the taking. After Vroman asked another officer how he might tan the hide of his illegal kill, the officer reported Vroman to his superiors. Vroman's superiors contacted Fish and Wildlife Protection, and Vroman later plead no contest to a misdemeanor violation.

The Soldotna Police Department held a hearing in January 2000 to determine if Vroman should be fired. The hearing report determined that "Vroman's ability to work with members of the police department, the District Attorney's Office and the court system" had been adversely impacted by Vroman's behavior and conviction. The report recommended termination. Chief of Police Shirley Warner terminated Vroman in February 2000.

Following the procedure established by Soldotna Municipal Code ("SMC") 2.28.050, Vroman filed a grievance with the city manager. The city manager reviewed Vroman's grievance and upheld the termination. Following the next step in the grievance procedure, Vroman requested arbitration of his grievance with the Employee Relations Board. According to SMC 2.28.050(D)(5), "either party may submit the matter to arbitration" within seven working days from the date of the city manager's written decision. Within stated limits, the arbitration is final and binding.[1]

Pursuant to SMC 2.30.040(B), the board consists of three members:

One member shall be appointed by the mayor and confirmed by the city council. One member shall be appointed by the city's employees pursuant to appropriate procedures devised by the employees' collective bargaining agent(s).... The third member shall be chosen by and mutually acceptable to the other two board members.

Vroman was informed by letter on March 30, 2000 that the "Council's representative [was] Ms. Sharon Moock, and the employee representative [was] Mr. Bob Byers."

The board scheduled a hearing on Vroman's grievance for June 15, 2000. Because Moock could not be in Soldotna on June 15, Soldotna Mayor Lancaster appointed Tim Cashman to serve in place of Moock. Mayor Lancaster had "talked with council members . . . about appointing Cashman" as an alternate after it became apparent that Moock could not appear on June 15. According to SMC 2.30.040(B), the City of Soldotna's representative on the Employee Relations Board must be appointed by the mayor and confirmed by the city council. The city council did not ratify Cashman prior to the June 15 hearing. Vroman was not informed before the hearing that Cashman would serve as the city's representative in place of Moock.

During the hearing on June 15, 2000 the members of the board, including Cashman, identified themselves by name. Vroman was present at the hearing and provided testimony. Cashman personally questioned witnesses, including Vroman, during the proceedings. Vroman did not object to the absence of Moock or the presence of Cashman at the hearing. On July 19, 2000, the board unanimously upheld Vroman's termination.

In an August 2000 letter, Vroman complained that the board was not lawfully constituted in accordance with the Soldotna Municipal Code because Cashman had not been confirmed by the city council as the city's representative. Shortly thereafter, the city council passed a measure purporting to retroactively ratify Cashman's appointment.

Vroman filed suit in superior court against the City of Soldotna on November 14, 2001, alleging that his termination constituted a breach of his employment contract and that the arbitration process violated the SMC and deprived him of due process. The superior court later converted the suit into an administrative appeal and denied Vroman's appeal on the grounds that he had waived any objections to Cashman's presence on the board by failing to raise them at the time. Additionally, the superior court held that because Cashman had colorable authority and his appointment did not affect the fairness of the arbitration, the *de facto* officer doctrine barred Vroman from arguing that Cashman's presence rendered the arbitration invalid.

Vroman appeals.

## III. STANDARD OF REVIEW

Vroman asks us to vacate the holding of a labor grievance arbitration proceeding. Though we normally apply the deferential "gross error standard in reviewing grievance arbitration awards,"[2] we review the selection of Cashman *de novo*. The only issue before this court is whether Cashman's irregular selection deprived the board of power to review Vroman's grievance. This does not require us to review the legal or factual conclusions of the board.

In similar circumstances, we apply *de novo* review to awards in arbitration taken pursuant to the Uniform Arbitration Act.[3] When reviewing such awards for claims of

2. *Alaska State Employees Ass'n/AFSCME Local 52 v. State,* 74 P.3d 881, 882 (Alaska 2003). Gross error "means that 'only those mistakes which are both obvious and significant' warrant reversing the arbitrator's award." *Fairbanks Fire Fighters Ass'n, Local 1324 v. City of Fairbanks,* 48 P.3d 1165, 1170 n. 30 (Alaska 2002) (quoting *Pub. Safety Employees Ass'n, Local 92, Int'l Union of Police Ass'ns, AFL–CIO v. State,* 895 P.2d 980, 984 (Alaska 1995)). We have also articulated a less deferential "arbitrary and capricious" standard for reviewing compulsory interest arbitration. *Pub. Safety Employees Ass'n, Local 92, Int'l Union of Police Ass'ns, AFL–CIO v. State,* 902 P.2d 1334, 1335 (Alaska 1995). (Compulsory arbitration is arbitration compelled by statute, and interest arbitration involves determining the terms of a contract.) This court has not addressed whether this less deferential standard should be applied to compulsory grievance arbitration. *Alaska State Employees Ass'n,* 74 P.3d at 882.

3. AS 09.43.010–180. The Uniform Arbitration Act does not apply to this case because the arbitration was not taken pursuant to contract. AS 09.43.010. Additionally, the act does not apply to labor-management contracts absent specific language in the contract incorporating it. *Id.* SMC 2.28.050(D)(5)(a) specifies that the arbitration shall be conducted pursuant to the Voluntary Labor Arbitration Rules of the American Arbitration Association but does not mention the Uniform Arbitration Act.

arbitrator bias, misconduct, or to determine if arbitrators have exceeded their powers, we do not apply the gross error standard of review.[4] Rather, we review superior court decisions regarding these defects *de novo.*[5]

■ Additionally, the board is a creature of Soldotna municipal law and operates as part of the city's administrative system. Arbitration before the board is not a bargained-for term of any contract. It is the final step in a legislatively-enacted grievance procedure.[6] Where this grievance procedure conflicts with a collective bargaining agreement, the terms of the agreement prevail.[7] Consequently, this appeal is similar to an appeal from an administrative review board. Ordinarily we directly review administrative decisions on appeal, substituting our judgment for the administrative agency when the question presented is an issue of law not subject to special agency expertise.[8]

Because this appeal involves a question of law, does not ascribe error to the board, involves a claim similar to other arbitration claims that we review *de novo,* and resembles an administrative appeal to which we would apply the "substitution of judgment" standard, we review the effect of the improper selection *de novo.*

4. *Marathon Oil Co. v. ARCO Alaska, Inc.,* 972 P.2d 595, 600 (Alaska 1999).

5. *Id.*

6. SMC 2.28.050.

7. SMC 2.30.110.

8. In an appeal from an agency decision, we directly review the agency action in question rather than the decision of the superior court. In considering administrative appeals, we have recognized four principal standards of review: The "substantial evidence" test is used for questions of fact. The "reasonable basis" test is used for questions of law involving agency expertise. The "substitution of judgment" test is used for questions of law where no expertise is involved. The "reasonable and not arbitrary" test is used for review of administrative regulations.
*State v. Pub. Safety Employees Ass'n,* 93 P.3d 409, 413 (Alaska 2004).

9. The city urges us not to reach the merits of this appeal, arguing that Vroman waived any challenge by failing to object to Cashman's presence on the arbitration board. But waiver requires a knowing intent to relinquish a right or privilege.

## IV. DISCUSSION

### Cashman's Actions Were Legitimate Under the *De Facto* Officer Doctrine.[9]

■ The *de facto* officer doctrine "confers validity upon acts performed by a person acting under the color of official title even though it is later discovered that the legality of that person's appointment or election to office is deficient."[10] The rationale underlying the doctrine is relatively straightforward. As the Second Circuit explained:

> The de facto officer doctrine was developed to protect the public from the chaos and uncertainty that would ensue if actions taken by individuals apparently occupying government offices could later be invalidated by exposing defects in the officials' titles. The doctrine has generally been applied to individuals who are in possession of an office, are performing the duties of the office, and who maintain an appearance of right to the office.[11]

■ Moreover, actions are considered *de facto* valid when the defect of authority is merely technical,[12] and whether an officer is in fact ineligible to hold the office is immaterial.[13]

*Hillman v. Nationwide Mut. Fire Ins. Co.,* 758 P.2d 1248, 1253 (Alaska 1988). In this case, only a strained reading of the facts could support the conclusion that Vroman's conduct showed such intent. Vroman had no reason to know, or even suspect, that Cashman had not been confirmed by the city council. On the other hand, there is no allegation in the record that Cashman failed properly to perform his duties or that he prejudiced Vroman's interests in any way. We think that application of the *de facto* officer doctrine strikes the proper balance under these circumstances.

10. *Nguyen v. United States,* 539 U.S. 69, 78, 123 S.Ct. 2130, 156 L.Ed.2d 64 (2003) (quoting *Ryder v. United States,* 515 U.S. 177, 180, 115 S.Ct. 2031, 132 L.Ed.2d 136 (1995)).

11. *EEOC v. Sears Roebuck & Co.,* 650 F.2d 14, 17 (2d Cir.1981) (internal citations omitted).

12. *Nguyen,* 539 U.S. at 78, 123 S.Ct. 2130 (quoting *Ryder,* 515 U.S. at 180, 115 S.Ct. 2031).

13. *Levine v. United States,* 221 F.3d 941, 943 (7th Cir.2000) (quoting *United States v. Mitchell,* 136 F. 896, 906 (D.Or.1905)).

We adopted the *de facto* officer doctrine in *Gates v. Tenakee Springs*,[14] holding that:

> an acting judge ... who has colorable authority due to his or her appointment is a de facto officer whose acts are legally binding on the public and on third persons if done within the scope and by the apparent authority of his or her office, even though the judge's actual authority suffers from a procedural defect.[15]

The appellant in *Gates* argued that a superior court decision was invalid because the *pro tem* judge who issued it was not a resident of Alaska as required by Alaska law.[16] In rejecting the appellant's claim, we outlined a series of considerations supporting the application of the *de facto* officer doctrine. We noted that it makes little sense to waste "valuable judicial and private resources" to relitigate matters "decided by a competent, unbiased judge."[17] Furthermore, the *de facto* officer doctrine "protects third parties and the public" by preventing relitigation on the basis of procedural defects irrelevant to the fairness of the substantive proceedings.[18]

**1. The *de facto* officer doctrine applies here because Cashman exercised colorable authority within the scope of the office and there is no reason to doubt the fairness and accuracy of the original arbitration.**

We turn to the question whether the purposes of the *de facto* officer doctrine would be served by applying it in this case. We must determine whether third parties would be protected by preserving the validity of acts performed by persons possessing colorable authority,[19] and whether wasteful relitigation of issues that were decided before a competent and unbiased judge or official whose appointment or election was only procedurally deficient would be prevented.[20] Although we have not addressed whether the *de facto* officer doctrine can confer validity on the acts of an improperly selected arbitrator, other jurisdictions have done so under similar circumstances.[21]

**14.** 954 P.2d 1035 (Alaska 1998). We have touched on the *de facto* officer doctrine in the corporate law context. *Afognak Native Corp. v. Olsen*, 648 P.2d 991, 992 (Alaska 1982) (corporate acts since disputed election remain valid because challenged directors are *de facto* officers). *See also Wolff v. Arctic Bowl, Inc.*, 560 P.2d 758, 764 n. 7 (Alaska 1977) (discussing *de facto* officer doctrine; case ultimately decided on other grounds); *Pavlik v. State of Alaska, Dep't of Cmty. and Reg'l Affairs*, 637 P.2d 1045, 1051 (Alaska 1981) (Dimond, J., dissenting) (*de facto* doctrine validates acts of challenged officials—election challenge thus would not prejudice those affected by officials' decisions).

**15.** 954 P.2d at 1038. Prior to *Gates*, the Alaska Court of Appeals employed the *de facto* officer doctrine to preserve the validity of work accomplished by a special prosecutor improperly appointed by a court, *State v. Breeze*, 873 P.2d 627 (Alaska App.1994), and to uphold a grand jury indictment when individual jurors had failed to take the oath. *State v. Roark*, 705 P.2d 1274 (Alaska App.1985).

**16.** *Gates*, 954 P.2d. at 1038 (citing AS 22.10.090).

**17.** *Id.*

**18.** *Id.* at 1038–39.

**19.** *Id.* at 1038.

**20.** *Id.*

**21.** In *Swanson v. Bd. of Police Comm'rs*, 197 Ill.App.3d 592, 144 Ill.Dec. 138, 555 N.E.2d 35, 38–39 (1990), a police officer appealed the decision of an administrative arbitration panel upholding his termination. He contested the panel's validity because one of its members had not been properly confirmed by the municipality. *Id.* at 39–40. The court did not reach any of Swanson's allegations of technical deficiencies because the member's "actions were at least valid as a de facto officer." *Id.* Similarly, in *Town of Stratford v. Local 407, AFSCME*, 3 Conn. App. 590, 490 A.2d 1021, 1022 (1985), a police officer appealed a decision of a state arbitration and mediation board upholding his termination. The officer claimed that the board lacked the power to review his grievance because three of its members had not taken their oaths of office. *Id.* After determining that state law did not require the board members to swear the particular oath cited by the officer, the court held the failure of two of the board members to swear a different oath did not undermine the board's legitimacy because of the *de facto* officer doctrine. *Id.* Lastly, in *Huff v. Sauer*, 243 Minn. 425, 68 N.W.2d 252, 254–55 (1955), the decision of a police civil service commission to terminate a probationary patrolman was upheld based on the *de facto* officer doctrine. Three commissioners were ineligible to serve because, contrary to Minnesota law, one commissioner was a state employee and two others did not swear oaths of office. *Id.*

Cashman was appointed to serve as Sharon Moock's alternate by Mayor Lancaster on May 19, 2000. Vroman has not argued that Cashman acted without colorable authority or beyond the scope of his apparent authority. Vroman has also not argued that Cashman was biased or unqualified. Vroman's only complaint is that the city did not follow the mandated selection procedure.

Because Cashman exercised colorable authority within the scope of the office and Vroman gives no reason to believe that his original arbitration was unfair or that a second arbitration would produce a different outcome, we apply the *de facto* officer doctrine and uphold the validity of the board's determination.

**2. The *de facto* officer doctrine applies here because the arbitration was based on the Soldotna Municipal Code, not on the terms of a collective bargaining agreement.**

Vroman argues that the "de facto officer doctrine does not apply ... because [this] case arises from a breach of a collective bargaining agreement." [22] It is Vroman's position that "the procedure for selecting an arbitrator must be followed because it is part of the contract." He argues that because Cashman was not "selected by employing the selection process that was agreed upon by the parties," the board did not have power to arbitrate the dispute. In sum, contract law requires strict compliance with the terms of an arbitration provision in an employment contract; this precludes any application of a doctrine that would countenance deviation from the procedure prescribed by the agreement.

Vroman cannot prevail on this claim, however, for nothing in the record supports his contention that the arbitration arose from a provision of any contract, much less a collective bargaining agreement. [23] In the superior court, Vroman argued only that the city violated the procedure for selecting its representative established in SMC 2.30.040. Soldotna Municipal Code 2.30.040 is a municipal ordinance enacted by the Soldotna City Council, not a provision of a collective bargaining agreement. Indeed, SMC 2.30.110, a provision within the same chapter as SMC 2.30.040, [24] provides that grievance procedures developed through collective bargaining will be applied in place of procedures enacted by the city. [25] But there is nothing in the present case to suggest that the selection provisions at issue originate in a collective bargaining agreement.

Vroman has not shown that the procedure for selecting arbitrators was part of any contract. Accordingly, and without deciding whether the *de facto* officer doctrine applies to an arbitrator selected in violation of contractual terms, we reject his argument that the doctrine does not apply in this case.

---

**22.** This argument was not framed clearly until the reply brief. Because Vroman does not mention the words "collective bargaining" in his opening brief, we could decline to reach this contention on the ground that it has been waived. *See Crittell v. Bingo*, 83 P.3d 532, 536 n. 19 (Alaska 2004) (holding that argument not raised below and developed primarily in reply brief on appeal is waived). *See also* Alaska R.App. P. 212(c)(3) (reply brief may raise no contentions not previously raised in appellant's or appellee's briefs). However, because Vroman generally argued in his opening brief that Cashman was not selected by the method "agreed upon by the parties," and in the interests of completeness, we exercise our discretion and consider the claim.

**23.** SMC 2.28.050 is explicitly designed to accommodate employment disputes involving union members and the interpretation of collective bargaining agreements. SMC 2.28.050 defines a grievance as "any disagreement between the city council or its management personnel and an employee of the city or the employee's collective bargaining agent, involving the conditions of employment or application of this code or a collective bargaining agreement." The ordinance envisions a role for shop stewards in the grievance process, SMC 2.28.050(D)(2)-(4), and specifies that the arbitration shall be conducted according to the Voluntary Labor Arbitration Rules of the American Arbitration Association *except* where those rules conflict with a collective bargaining agreement.

**24.** SMC 2.30 governs the city's relations with its collective bargaining units.

**25.** SMC 2.30.110 provides: "Except as these provisions may be modified for covered employees by the terms of a collective bargaining agreement, employee grievances shall be handled according to Section 2.28.260 [sic: 2.28.050] of the city municipal code."

## V.  CONCLUSION

Because Tim Cashman had colorable authority due to his appointment by Mayor Lancaster and acted within the scope and by the apparent authority of his office, we AFFIRM the decision of the superior court.

FABE, Justice, not participating.