*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 19-CV-266, 19-CV-670, 19-CV-1242

CLAUDIA A. BARBER, JESSE P. GOODE, AND CARYN HINES, APPELLANTS,

V.

D.C. COMMISSION ON SELECTION AND TENURE OF ADMINISTRATIVE LAW JUDGES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CAP-6576-16, CAP-7291-17, CAP-5382-16)

(Hon. Neal E. Kravitz, Heidi M. Pasichow, Kelly A. Higashi, Trial Judges)

(Argued March 9, 2021                    Decided September 23, 2021)

*David A. Branch* for appellant Barber.

*Stephen C. Leckar*, with whom *Evan Lisull* was on the brief, for appellants Goode and Hines.

*Stacy L. Anderson*, Senior Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. Alikhan*, Solicitor General, *Caroline S. Van Zile*, Principal Deputy Solicitor General, and *Carl J. Schifferle*, Deputy Solicitor General, were on the brief, for appellee.

Before GLICKMAN and THOMPSON,[*] *Associate Judges*, and GREENE, *Senior Judge, Superior Court of the District of Columbia*.[**]

GLICKMAN, *Associate Judge*: In the District of Columbia, decisions concerning the appointment, reappointment, removal, and discipline of Administrative Law Judges ("ALJs") in the Office of Administrative Hearings ("OAH") are entrusted to the Commission on Selection and Tenure of Administrative Law Judges ("COST").[1] Appellants in these consolidated cases are former ALJs who challenge determinations by the Superior Court that it could not review COST's decisions to remove Appellant Barber and not to reappoint Appellants Goode and Hines. For the following reasons, we affirm the Superior Court rulings.

---

[*] Judge Thompson was an Associate Judge of the court at the time of argument. Although Judge Thompson's term ended on September 4, 2021, she continues to serve as an Associate Judge until her successor is confirmed. *See* D.C. Code § 11-1502 (2012 Repl.) ("Subject to mandatory retirement at age 74 and to the provisions of subchapters II and III of this chapter, a judge of a District of Columbia court appointed on or after the date of enactment of the District of Columbia Court Reorganization Act of 1970 shall serve for a term of fifteen years, and upon completion of such term, such judge shall continue to serve until the judge's successor is appointed and qualifies.").

[**] Sitting by designation pursuant to D.C. Code § 11-707(a) (2012 Repl.).

[1] D.C. Code § 2-1831.06(b) (2016 Repl.) ("COST shall have final authority to appoint, reappoint, discipline, and remove Administrative Law Judges.").

# I. Background

## A. Removing and Reappointing ALJs

COST is a public body that was created by the Office of Administrative Hearings Establishment Act of 2001 ("Establishment Act").[2] It consists of three voting members and two nonvoting ("*ex officio*") members.[3] The voting members serve staggered three-year terms and are eligible for reappointment.[4] COST's mission is to "ensure the recruitment and retention of a well-qualified, efficient, and effective corps" of ALJs.[5] ALJs are responsible for the "fair, impartial, effective, and efficient disposition" of the broad range of disputes "to which they are assigned."[6]

---

[2] *Id.* § 2-1831.06(a).

[3] *Id.* § 2-1831.07(a).

[4] *Id.* § 2-1831.07(c)-(d).

[5] *Id.* § 2-1831.06(a).

[6] *Id.* § 2-1831.08(a); *see also id.* § 2-1831.03.

ALJs serve set terms: initially for two years, then for six or ten years at a time.[7] An ALJ who seeks reappointment for a new term must file a statement with COST requesting reappointment at least six months before the previous appointment expires.[8] The Chief ALJ then prepares for COST a record of the ALJ's "performance with regard to that judge's efficiency, efficacy, and quality of performance over the period of his or her appointment."[9] The record includes copies of the ALJ's performance evaluations, prior decisions, and a recommendation from the Chief ALJ "with a statement of reasons, as to whether the ALJ should be reappointed."[10] The voting members of COST "shall give significant weight" to the Chief ALJ's recommendation, "unless it is determined that the recommendation is not founded on substantial evidence."[11] COST regulations provide that it "shall reappoint" an ALJ if it finds that the ALJ "has satisfactorily performed the responsibilities of his or her office and is likely to continue to do so."[12] COST must

---

[7] *Id.* § 2-1831.08(c).

[8] *Id.* § 2-1831.10(b); *see also* 6-B D.C.M.R. § 3705.1 (2021).

[9] D.C. Code § 2-1831.10(b); *see also* 6-B D.C.M.R. § 3705.4.

[10] *Id.*

[11] D.C. Code § 2-1831.10(b); *see also* 6-B D.C.M.R. § 3705.21.

[12] 6-B D.C.M.R. § 3705.21.

issue a written statement of reasons for every decision to reappoint or not reappoint an ALJ.[13]

ALJs are subject to removal "only for cause."[14] COST may determine whether a formal proceeding to remove an ALJ should be instituted pursuant to "a proposal of the Chief [ALJ], or upon receiving information giving it reason to believe that there may be cause" for removal.[15] Before instituting the formal proceeding, COST must "serve the [ALJ] with notice of the investigation and offer the [ALJ] an opportunity to meet" with COST members.[16] The formal proceeding itself consists of a hearing conducted in accordance with D.C. Code § 2-509 (2016 Repl.) "and any other applicable law."[17] A quorum of two COST voting members[18]

---

[13] *Id.* § 3705.22.

[14] D.C. Code § 2-1831.10(d); *see also* D.C. Code § 1-609.08 (2016 Repl.).

[15] 6-B D.C.M.R. § 3730.1.

[16] 6-B D.C.M.R. § 3730.6. D.C. Code § 2-1831.10(d) provides more generally that an ALJ facing removal has the "right to notice and a hearing."

[17] 6-B D.C.M.R. § 3735.8.

[18] § 2-1831.07 (b) ("A majority of COST's voting members shall constitute a quorum"). Because there are three voting members, two are required to form a quorum.

must be present to preside over the hearing,[19] in which the ALJ "shall be given every reasonable opportunity to defend himself or herself against the charges . . . including the introduction of evidence and . . . cross-examination of witnesses."[20] Following the hearing, COST is directed to issue its written findings of facts and conclusions of law within ninety days.[21]

The Establishment Act states that "COST shall have final authority to appoint, reappoint, discipline, and remove Administrative Law Judges,"[22] and does not provide for judicial review of those decisions. The implementing regulations state that any non-reappointment or removal decision "shall be reviewable only to the same extent as a decision of the District of Columbia Commission on Judicial Disabilities and Tenure giving an evaluation of 'Unqualified.'"[23] An "unqualified" evaluation by the Disabilities and Tenure Commission means that a judge has been deemed "unfit for further judicial service."[24] A judge may seek review of this

---

[19] 6-B D.C.M.R. § 3735.7.

[20] 6-B D.C.M.R. § 3735.14.

[21] 6-B D.C.M.R. § 3736.

[22] D.C. Code § 2-1831.06(b).

[23] 6-B D.C.M.R. §§ 3705.24, 3737.3.

[24] 28 D.C.M.R. § 2031 (c).

determination only by filing a notice of appeal with the Chief Justice of the United States Supreme Court.[25]

In October 2017, the Office of Open Government ("OOG") issued a report disclosing "troubling gaps between [the] terms" of COST's voting members dating back to 2003.[26] The report noted "evidence, based upon review of records of COST meetings, that official actions were taken when members of the COST may have been improperly held over, and therefore improperly seated."[27]

Three voting members of COST identified as holdover appointees in the OOG report were involved in that status in appellants' cases. These were Commissioners Williams, Onek, and Cooper.

On December 16, 2013, Superior Court Chief Judge Morin selected Associate Judge Yvonne Williams to replace his previous appointee as a voting member of COST. Judge Williams's appointment letter stated that her term would expire on

---

[25] D.C. Code § 11-1529(a) (2012 Repl.).

[26] Board of Ethics and Government Accountability, Office of Open Government Complaint Report #OOG-0003 at 15 (Oct. 30, 2017).

[27] *Id*.

December 16, 2016, despite the fact that the previous appointee's term would have ended, in accordance with the statute, on April 30, 2015.[28] Judge Williams was not reappointed to the COST on May 1, 2015 or on December 17, 2016. Instead, Chief Judge Morin eventually issued a reappointment order on August 1, 2017, effective *nunc pro tunc* to December 16, 2016. Judge Williams continued to actively serve on COST in the interval between April 30, 2015, and August 1, 2017.

The Council appointed Joseph Onek as a voting member of COST on June 3, 2014. By statute, his term ended on April 30, 2017.[29] However, Commissioner Onek held over in his COST position for approximately five months until he was reappointed by the Council on September 22, 2017.

The Mayor appointed James Cooper as a COST voting member on November 1, 2013. His term ended on April 30, 2016,[30] but he continued to serve as a voting member until March 15, 2017 (when Robert Hawkins replaced him).

---

[28] D.C. Code § 2-1831.07(d) provided that the Superior Court appointee's terms would be from May 1, 2012, to April 30, 2015, and then from May 1, 2015, to April 30, 2018.

[29] *Id.* The terms for the Council's appointee were from May 1, 2014, to April 30, 2017, and then from May 1, 2017, to April 30, 2020.

[30] *Id.* The terms for the Mayor's appointee were from May 1, 2013, to April 30, 2016, and then from May 1, 2016, to April 30, 2019.

## B. Appellant Barber

Claudia Barber served as an ALJ from 2005 to 2016. In late 2015, she began to consider running for a Fifth Circuit judgeship in Anne Arundel County, Maryland. Section V.U. of the OAH's Code of Ethics ("Section V.U.") requires ALJs to "resign from judicial office when the[y] become[] a candidate either in a party primary or a general election." Violating this provision is grounds for removal.[31]

Ms. Barber asked ALJ James Harmon, who chaired OAH's ethics committee, for his opinion as to whether she could become a candidate for the Maryland judgeship without resigning as an ALJ or facing removal. ALJ Harmon advised her that she would have to resign her position if the election involved a party primary or a partisan general election. Ms. Barber solicited COST's opinion on the same question. Judge Williams responded that COST "was not the appropriate forum to consider this issue," and recommended that Ms. Barber contact the Board of Ethics and Government Accountability ("BEGA"). The general counsel for BEGA eventually told Ms. Barber that his organization could not "opine on whether running for judicial office would comport with any OAH rules that apply to ALJs."

---

[31] 6-B D.C.M.R. § 3729.1(a).

Following this exchange, Ms. Barber emailed Judge Williams asking for "reassurance from [COST] . . . that I would not be forced to resign under Section V.U. of our ethics code." She did not receive a reply.[32]

In January 2016, Ms. Barber filed her certificate of candidacy for the Maryland judgeship, without resigning from OAH. Two weeks later, Chief ALJ Eugene Adams received a formal complaint that Ms. Barber had violated Section V.U. by entering a partisan political election. After asking Ms. Barber for an explanation,[33] Chief ALJ Adams placed her on paid administrative leave and requested her resignation. Ms. Barber refused to resign, and Chief ALJ Adams recommended her removal to COST.

---

[32] Ms. Barber also made inquiries to the Maryland State Ethics Commission and the Maryland State Board of Elections regarding whether the judicial election would be considered "partisan." The director of the Ethics Commission replied that the Commission had not issued any opinion on this topic and that it was not within the Commission's jurisdiction. According to Barber (in her testimony during the COST removal hearing), a Board of Elections official told her, over the phone, that she would not need to provide her party affiliation when filing her certificate of candidacy. She acknowledged that the official did not actually tell her the judicial election was non-partisan.

[33] Ms. Barber told Chief ALJ Adams that she had had "this issue fully vetted by [BEGA] long ago, at the direction of" Judge Williams, that "BEGA cleared [her] on this issue," and that the "Maryland State Board of Elections confirmed for [her] as well that [her] Certificate of Candidacy is not partisan."

On May 17, 2016, COST notified Ms. Barber that a formal removal proceeding had been instituted against her. After a hearing, at which Ms. Barber testified, COST found that she had participated in a party primary, in contravention of Section V.U.'s prohibition, and removed her from her position as an ALJ, effective immediately. At the time this decision was made, two of the three COST voting members — Judge Williams and Commissioner Cooper — were serving in that capacity beyond the end of their statutory terms.[34] However, in the proceedings before COST, Ms. Barber did not object to their participation or raise any issue about their status as voting members of COST.

## C. Appellant Goode

Jesse P. Goode served as an ALJ from 2005 to 2017. He sought reappointment for an additional term in early 2016. While compiling the required performance record for submission to COST, Chief ALJ Adams received several negative reports concerning Mr. Goode's interactions with OAH staff, colleagues, and management

---

[34] Appellee does not contend that Chief Judge Morin's *nunc pro tunc* order retroactively cured Judge Williams's appointment defect, nor that her term did not in fact end on April 30, 2015.

that came to light after his reappointment request was made public.[35]   In light of these reports, Chief ALJ Adams advised COST that he could not recommend Mr. Goode's reappointment.

On July 19, 2017, COST held a meeting to consider Mr. Goode's reappointment.  Two days before the meeting, COST received a letter from the Chairman of the D.C. Council, Phil Mendelson.   The letter advised that Commissioner Onek's term as a voting member of COST had expired and that it was expected that the Council would reappoint him in October.  This meant, the letter stated, that Commissioner Onek was currently a "holdover, which is to say the seat is technically vacant until the Council acts."  Commissioner Onek participated in the July 19 meeting, along with Judge Williams and the third voting member, Commissioner Hawkins.  Both Judge Williams and Commissioner Onek were past the end of their terms at this time.  Commissioner Onek briefly acknowledged the potential implications of his presence given that he had not yet been formally reappointed to his second term, but ultimately brushed the issue aside.[36]  Mr. Goode,

---

[35]  When an ALJ submits a statement of intent to seek reappointment, COST publicizes a notice of the statement in the District of Columbia Register, and solicits the views of "litigants, attorneys, and members of the public on whether the [ALJ] should be reappointed."  6-B D.C.M.R. §§ 3705.7–3705.9.

[36]  Commissioner Onek stated, with respect to the expiration of his term "Well, just for the record, that — all of that has to be resolved.  I felt that I should be here

who attended the meeting with counsel, did not object to Commissioner Onek's or Judge Williams's presence. Two days after the meeting, Mr. Goode's counsel sent a letter to COST noting that Commissioner Onek's appointment to COST had expired. The letter requested that COST "defer any [ALJ] reappointment decisions until Mr. Onek or his replacement is reconfirmed." The letter did not mention Judge Williams. COST made no decision on Mr. Goode's reappointment at this time.

As previously mentioned, Judge Williams and Commissioner Onek were reappointed to COST on August 1 and September 22, 2017, respectively. Thereafter, on September 29, 2017, COST sent Mr. Goode a letter informing him that it accepted Chief ALJ Adams's recommendation that Mr. Goode not be reappointed as an ALJ. The letter stated that COST's decision was final, and reviewable only to the extent provided for in 6-B D.C.M.R. § 3705.24.

### D. Appellant Hines

Caryn Hines served as an ALJ from 2008 to 2016. She sought reappointment for an additional term in late 2015. On April 13, 2016, Chief ALJ Adams

---

and participate . . . Furthermore, the chairman has indicated that I will be reappointed, so — at some point . . . I am in a somewhat awkward position, but I am here, and I decided to ask a question and — whatever."

recommended that COST not reappoint Ms. Hines, primarily because of her perceived inefficiency in resolving rental housing and unemployment insurance cases.

On June 21, 2016, COST met with Ms. Hines and her counsel to consider her request to be reappointed. The participating voting members of COST at this meeting were Judge Williams, Commissioner Cooper, and Commissioner Onek. Both Judge Williams and Commissioner Cooper were holding over beyond their terms of office. Ms. Hines did not object to their holdover participation. The COST members questioned Ms. Hines and her counsel on her lack of productivity. Ms. Hines denied that her performance was unsatisfactory compared to that of other ALJs.

Later that same day, COST gave Ms. Hines written notice that she would not be reappointed as an ALJ. The notice stated that COST's decision was "final." Unlike the letter Mr. Goode received, Ms. Hines's notice did not mention any possibility of review.

### E. Efforts to Obtain Judicial Review of the COST Removal and Non-Reappointment Decisions

Ms. Barber and Ms. Hines initially filed petitions in this court for review of COST's removal and non-reappointment decisions in their cases. We dismissed the petitions, holding that we did not have jurisdiction to consider their claims directly.[37] In doing so, we expressed no view as to whether judicial review of the decisions was otherwise available.[38]

All three appellants subsequently sought review of COST's decisions in Superior Court. Their suits alleged that these decisions should be reversed because they were tainted by several procedural errors, including (1) COST's failure to meet with Ms. Barber before the commencement of the formal removal proceeding, (2) COST's failure to mention appeal rights in its final order removing Ms. Barber, (3) COST's denial of Ms. Barber's request to call expert witnesses during her removal hearing, (4) COST's rejection of Mr. Goode's request to interview and cross-examine individuals who contributed to Chief ALJ Adams's negative

---

[37] *Hines v. District of Columbia Comm'n on Selection and Tenure of Admin. L. Judges*, 183 A.3d 1283, 1284 (D.C. 2018).

[38] *Id.* at 1284 n.1.

recommendation, and (5) purported *ex parte* communications between Chief ALJ Adams, counsel for OAH, and COST.

Ms. Barber and Mr. Goode also challenged COST's composition in Superior Court. Ms. Barber argued that Judge Williams's term had lapsed, and Mr. Goode contended that both Judge Williams and Commissioner Onek were seated unlawfully when COST considered his reappointment request in July 2017.

In Ms. Barber's case, Associate Judge Kravitz concluded the Superior Court had no jurisdiction to review COST's removal order because there was clear and convincing evidence of the Council's intent to preclude judicial review. Judge Kravitz reasoned that the Council's vesting of "final authority" in COST to remove ALJs[39] "plainly suggests that the D.C. Council intended to commit the removal of ALJs entirely to COST's discretion." Reinforcing this conclusion, Judge Kravitz noted, is the fact that excepted service employees — a statutory category of government employees that specifically includes ALJs — are expressly denied the right to appeal their terminations.[40] On essentially the same jurisdictional grounds,

---

[39] D.C. Code § 2-1831.06(b).

[40] *See* D.C. Code §§ 1-609.05 (2016 Repl.) (stating an excepted service employee "does not have any right to appeal [their] termination"); 1-609.08(15) (ALJs are deemed to be excepted service employees); § 2-1831.08(b) ("An

Associate Judges Pasichow and Higashi dismissed Mr. Goode's and Ms. Hines's appeals of COST's decisions not to reappoint them.[41]

The three former ALJs timely appealed the Superior Court's rulings. We consolidated their appeals.

## II. Discussion

This court has not heretofore decided whether an ALJ may obtain judicial review of a removal or reappointment decision by COST pursuant to D.C. Code §

---

Administrative Law Judge shall be appointed to the Excepted Service as a statutory officeholder pursuant to § 1-609.08 . . . .").

[41] Judge Kravitz recognized that his conclusion on jurisdiction disposed of Ms. Barber's appeal without consideration of the merits of her claims. Nevertheless, in "an effort to be complete," he found that (1) COST did not err in determining that Ms. Barber had violated Section V.U, because she did become a candidate in the 2016 Democratic and Republican party primaries for the Maryland judgeship, and (2) COST did not violate Ms. Barber's due process rights by failing to meet with her before the commencement of the formal removal proceedings, not mentioning appeal rights in its removal order, or allegedly engaging in *ex parte* communications with Chief ALJ Adams. Judge Kravitz further determined that "the de facto officer doctrine likely preserves COST's decision even if Judge Williams' participation was pursuant to what was in reality an expired appointment."

Judges Pasichow and Higashi refrained from addressing the merits of Mr. Goode's and Ms. Hines's appeals.

2-1831.06(b). The question is one of law, primarily a matter of statutory interpretation. Our review is *de novo*.[42]

## A. Reviewability of COST Decisions under D.C. Code § 2-1831.06(b)

Administrative agency action in the District is presumptively subject to judicial review,[43] but this presumption can be "rebutted by clear and convincing evidence of a contrary legislative intent."[44] Appellants dispute the existence of such evidence of a legislative intent to bar judicial review of COST decisions. They argue that the provision of the Establishment Act vesting "final authority" in COST over the "appointment, reappointment, removal, and discipline" of ALJs means only that, once COST has spoken, "an ALJ has cleared all administrative steps necessary to seek [judicial] review."

---

[42] *Washington Tchrs.' Union, Loc. #6 v. District of Columbia Pub. Schs.*, 960 A.2d 1123, 1132 (D.C. 2008).

[43] *Nunnally v. District of Columbia Metro. Police Dep't*, 80 A.3d 1004, 1008 (D.C. 2013).

[44] *Coleman v. District of Columbia*, 80 A.3d 1028, 1031 (D.C. 2013). "[T]he requirement of 'clear and convincing evidence' to rebut the presumption in favor of judicial review is not to be applied 'in the strict evidentiary sense,' and is met 'whenever the congressional intent to preclude judicial review is fairly discernible in the statutory scheme.'" *Id.* at 1031 n.3 (citing *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 350-51 (1984)).

Appellee rejects this reading of the statute and argues that the plain language of D.C. Code § 2-1831.06(b) gives COST complete and unreviewable discretion over the reappointment and removal of ALJs. Appellee contends that by using the words "final authority," the Council could not have meant that COST's decision was merely the start of a process for review of such decisions in other venues.

For the following reasons, we agree with appellee that clear and convincing evidence overcomes the presumption of reviewability and shows that the Council unquestionably intended to foreclose judicial (or other) review of tenure decisions committed to COST by the Establishment Act.

First and foremost is the plain language of the statute.[45] Section 2-1831.06(b) provides that "COST shall have final authority to appoint, reappoint, discipline, and remove Administrative Law Judges." Among all District of Columbia statutes, the Establishment Act is almost unique in explicitly vesting "final authority" in a decision-making body.[46] In common and legal parlance, the word "final" is usually

---

[45] *Lucas v. United States*, 240 A.3d 328, 335 (D.C. 2020) ("Questions of statutory interpretation begin with the plain language of the statute, and we construe words according to their ordinary meaning.").

[46] As far as we are aware, only one other District statute pairs the adjective "final" with the term "authority" — D.C. Code § 2-1602(b) (2016 Repl.), which provides that the courts retain "final authority" to appoint private attorneys for

understood to mean "not to be changed or reconsidered; unalterable,"[47] while the word "authority" denotes the "power to . . . command, determine, or judge."[48] On their face, the words "final authority" do not merely suggest, they *mean* that COST's exercise of its power over ALJs is not subject to judicial or other revision.

Second, other courts have interpreted statutes vesting "final authority" to make a decision in a particular entity as excluding judicial review of that decision. For example, the National Labor Relations Act provides that the general counsel of the National Labor Relations Board "shall have *final authority* . . . in respect of the investigation of charges[,] . . . issuance of complaints . . . and . . . prosecution of such complaints before the Board."[49] "In a long and unbroken series of decisions by the Supreme Court and the Courts of Appeal, this provision . . . ha[s] been interpreted

---

indigent defendants. This court has not had occasion to interpret that language in a reported case.

[47] *Final*, THE AMERICAN HERITAGE DICTIONARY (5th ed. 2020); *see also Final*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("not requiring any further judicial action . . . concluded"); *Final*, MERRIAM-WEBSTER.COM ("not to be altered or undone").

[48] *Authority*, THE AMERICAN HERITAGE DICTIONARY (5th ed. 2020); *see also Authority*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The official right or permission to act"); *Authority*, MERRIAM-WEBSTER.COM ("power to influence or command").

[49] 29 U.S.C. § 153(d) (emphasis added).

to preclude judicial review . . . ."[50]  As the Supreme Court put it in *NLRB v. Sears, Roebuck & Co.*, "Congress has delegated to the Office of General Counsel . . . the unreviewable authority to determine whether a complaint shall be filed."[51]  State courts interpreting analogous provisions of their own laws containing the term "final authority" have reached similar conclusions.[52]  Appellants cite no case in which an express statutory delegation of "final authority" to make a determination has been construed to permit judicial review of that determination.

Third, construing the COST's "final authority" over ALJ tenure decisions otherwise, i.e., as implicitly permitting judicial review, would conflict with the

---

[50]  *Becker v. NLRB*, 678 F. Supp. 406, 408 (E.D.N.Y. 1987) (citing *Vaca v. Sipes*, 386 U.S. 171, 182 (1967)); *see, e.g.*, *NLRB v. United Food and Com. Workers Union, Local 23, AFL-CIO*, 484 U.S. 112, 127–29 (1987); *Bova v. Pipefitters & Plumbers Local 60, AFL-CIO*, 554 F.2d 226, 228 (5th Cir. 1977)); *United Elec. Contractors Ass'n v. Ordman*, 366 F.2d 776, 776 (2d Cir. 1966); *Dunn v. Retail Clerks Int'l Ass'n, AFL-CIO*, 307 F.2d 285, 288 (6th Cir. 1962).

[51]  421 U.S. 132, 138 (1975).

[52]  *See, e.g., United Farmworkers of America, AFL-CIO v. Arizona Agric. Emp't Rels. Bd.*, 672 P.2d 1327, 1331 (Ariz. Ct. App. 1983) ("[T]he legislature intended that . . . general counsel's discretion to either file or refuse to file a complaint is absolute and not judicially reviewable. *The language of the statute that general counsel is the 'final authority' clearly mandates that result*.") (emphasis added).

Council's explicit decision in §2-1831.08(b) of the Establishment Act[53] to place

ALJs in the category of excepted service employees who, under the Comprehensive

Merit Personnel Act, "do not have any right to appeal their termination."[54]

Appellants attempt to minimize the importance of § 2-1831.08(b) by pointing out

that District law places ALJs within a special sub-category of excepted service

employees, known as "Statutory Officeholders,"[55] who (unlike regular excepted

service employees) are removable only for cause.[56]  But additional job protections

are not necessarily synonymous with the availability of judicial review.  *United

States v. Fausto*,[57] in which the Supreme Court ruled that a petitioner who was a

"nonpreference member of the excepted service" did not have a statutory right to

---

[53]  *See George v. Dade*, 769 A.2d 760, 764 (D.C. 2001) ("Where two or more statutes relate to the same subject area, we construe them together. *See Harman v. United States*, 718 A.2d 114, 117 (D.C. 1998).  'If statutes conflict, our task is to reconcile them if possible.' *Id.* (referencing *Gonzalez v. United States*, 498 A.2d 1172, 1174 (D.C. 1985)) ('[W]e have a duty to make every effort to reconcile allegedly conflicting statutes and to give effect to the language and intent of both.') (citation and internal quotation omitted).").

[54]  D.C. Code § 1-609.05.

[55]  D.C. Code § 1-609.08.

[56]  *Id.*

[57]  484 U.S. 439 (1988).

judicial review,[58] refutes that position. In fact, the Court concluded in *Fausto* that this aspect of the statutory scheme militated *against* the petitioner:

> Although Congress extended . . . [procedural job] protections to nonpreference members of the excepted service, it denied them the right to seek either administrative or judicial review of the agency's final action. . . . . The comprehensive nature of the [statute], the attention that it gives throughout to the rights of nonpreference excepted service employees, and the fact that it does not include them in provisions for administrative and judicial review . . . combine to establish a congressional judgment that those employees should not be able to demand judicial review . . . .[59]

A similar analysis supports the same conclusion here. Judicial oversight of COST's tenure decisions is not essential to fulfilling the goals of the Establishment Act. The legislative history of the Act reveals that COST was "developed in response to concerns by Councilmembers" who opposed investing the Chief ALJ alone with the power to appoint, remove, reappoint, and discipline ALJs.[60] Accordingly, the Council created a deliberative, multi-member body to make these

---

[58] *Id*. at 441 n.1, 444–46.

[59] *Id*. at 446–48.

[60] Report on Bill 14-208, the "Office of Administrative Hearings Establishment Act of 2001," before the Committee on the Judiciary, Council of the District of Columbia, at 9 (Sept. 25, 2001).

determinations and equipped it with the tools necessary to comprehensively evaluate the capabilities of current and future ALJs. The Establishment Act instructs COST's voting members to consider a lengthy record for each ALJ seeking reappointment, which must contain (1) information on the ALJ's "efficiency, efficacy, and quality of performance," (2) at least one year of decisions authored by the ALJ, (3) "data on how the [ALJ] has met applicable objective performance standards," (4) the recommendation of the Chief ALJ, and (5) "any other information requested" by COST or its members.[61] The care that the Council took to ensure COST's voting members would be well-informed of all facts relevant to an ALJ's tenure suggests that it envisioned COST as the decisive arbitrator on this topic. And the fact that the Council specifically provided ALJs with greater job protections than other excepted service employees, while simultaneously deciding not to exempt them from the general bar on appealing termination, speaks to a deliberate legislative judgment that they should be prevented from seeking review.[62]

---

[61] D.C. Code § 2-1831.10(b).

[62] *See Fausto*, 484 U.S. at 455 ("The CSRA established a comprehensive system for reviewing personnel action taken against federal employees. Its deliberate exclusion of employees in respondent's service category from the provisions establishing administrative and judicial review for personnel action of the sort at issue here prevents respondent from seeking review.").

Fourth, that the Establishment Act means to preclude judicial review of COST tenure decisions involving ALJs in general is confirmed by the fact that the Act does contain one explicit exception — it grants a special, limited right of appeal to the Chief ALJ (who is, like all ALJs, in the excepted service).[63]  This exception would have been unnecessary if judicial review were otherwise available.  Obviously, the Council knew perfectly well how to make judicial review available for rank-and-file ALJs despite their excepted service status — it simply chose not to do so.[64]

---

[63]  *See* D.C. Code § 2-1831.04(d) ("At the conclusion of his or her term or a period of service of at least 2 years, the Chief Administrative Law Judge shall have the right to assume a position as a full-time or part-time Administrative Law Judge for a full 6-year term; provided, that he or she shall have no such right if he or she was removed from office for cause, or if the Mayor makes a written finding within 60 days of the effective date of the Chief Administrative Law Judge's resignation or the end of the Chief Administrative Law Judge's term, whichever is earlier, that cause for removal existed at or before the conclusion of his or her period of service. *Such a finding is subject to a right of appeal*."  (Emphasis added.)); § 1-609.08(15) (providing that the Chief ALJ "shall be deemed to be in the Excepted Service").

[64]  We are mindful of the provision in the regulations that any non-reappointment or removal decision "shall be reviewable only to the same extent as a decision of the District of Columbia Commission on Judicial Disabilities and Tenure giving an evaluation of 'Unqualified.'"  6-B D.C.M.R. §§ 3705.24, 3737.3.  The validity and feasibility of this regulation, which implies that an aggrieved ALJ could petition the Chief Justice of the United States to review his or her removal or non-reappointment, are surely doubtful.  But whatever we may think of this provision, it certainly does not support judicial review of COST decisions in the Superior Court or this court.  Rather, the provision recognizes that such review is not an option.

Appellants contend that only an express prohibition against judicial review can clearly and convincingly overcome the presumption in favor of judicial review of agency action. But our case law has rejected that position and acknowledged that legislation can implicitly preclude review.[65] Where, as here, the statute's plain language, its underlying purpose, and the general statutory scheme all point towards the exclusion of judicial review, the absence of an express prohibition of it is not dispositive.[66]

## B. Possible Exceptions to Statutory Bar on Judicial Review

Appellants propose there exist two alternative routes for obtaining judicial review of their tenure decisions even if the Establishment Act does generally preclude such review. First, they argue that our decision in *Martin v. District of Columbia Courts* established a narrow path to judicial review in comparable

---

[65] *See Tucci v. District of Columbia*, 956 A.2d 684, 690 (D.C. 2008); *Washington Tchrs.' Union, Loc. #6 v. District of Columbia Pub. Schs.*, 960 A.2d 1123, 1132 (D.C. 2008); *Martin v. District of Columbia Cts.*, 753 A.2d 987, 992 (D.C. 2000); *People's Couns. of the District of Columbia v. Pub. Serv. Comm'n of the District of Columbia.*, 474 A.2d 1274, 1279 (D.C. 1984) (Ferren, J., concurring).

[66] *See Coleman*, 80 A.3d at 1031 n.3; *see also* 73A C.J.S. Public Administrative Law and Procedure § 385 ("[S]tatutory silence is not determinative, each statute must be carefully examined to discover the intent to restrict judicial review of administrative action.").

circumstances when the aggrieved party claims the agency failed to follow its own rules. Second, they contend that the COST decisions are subject to review (and, indeed, vacatur) because the statutorily fixed terms of some of the COST voting members had expired. We address each of these arguments in turn.

### 1. *Martin*

In *Martin*, a D.C. Courts employee sought review in Superior Court of an adverse employment decision by the Courts' Executive Officer. Mr. Martin claimed his firing contravened the D.C. Courts' Comprehensive Personnel Policies ("CPP") governing removal of court employees because the CPP required the Executive Officer to recuse himself due to his alleged prior involvement in the matter from which the termination arose.[67] The trial court dismissed Mr. Martin's petition for review on the ground that court personnel were "not entitled to judicial review of adverse employment decisions" under the District of Columbia Courts Reorganization Act of 1970 (the Reorganization Act).[68]

---

[67] 753 A.2d at 990.

[68] *Id.*

We reversed. The issue on appeal was whether, and if so to what extent, the presumption of judicial reviewability was rebutted by clear and convincing evidence of a contrary legislative intent.[69] We found that there was such evidence, but that it only went so far. We recognized that, in "marked contrast" to the appellate rights afforded other government employees by the Comprehensive Merit Personnel Act (CMPA), neither the Reorganization Act nor the CPP granted court employees a right to judicial review of removal and other adverse employment decisions.[70] Instead, we explained,

> Congress authorized the Joint Committee [on Judicial Administration] to establish separate regulations governing the removal of nonjudicial court employees, without requiring those regulations to provide for judicial review. Further, Congress authorized the Executive Officer of the D.C. Courts to remove employees such as Martin subject only to the regulations established by the Joint Committee and purely discretionary oversight of the appropriate Chief Judge.[71]

This constituted "the requisite clear and convincing evidence . . . of an implicit legislative intent to preclude judicial review — or, more precisely, to authorize the

---

[69] *Id.* at 991.

[70] *Id.* at 993 ("Congress intentionally excluded nonjudicial court employees such as Martin from coverage by the CMPA, which permits judicial review of adverse employment decisions.").

[71] *Id.*

Joint Committee to preclude such review in the regulations it adopted [the CPP] —
*of removal decisions made in accordance with those regulations*."[72]

However, we said, "that is as far as the permissible inference may go in this
case, which is not far enough to foreclose judicial review of Martin's claim" that his
removal was *not* in accordance with the CPP.[73]  "We discern[ed] no congressional
intent to foreclose judicial review of a claim that the D.C. Courts violated the
procedures for removal which the Joint Committee promulgated at Congress's
direction."[74]  Rather, we reasoned, "[t]hat the CPP provisions constitute mandatory
regulations issued under the authority of [the Reorganization Act] implies that the
procedural limitations in the CPP on the power of the D.C. courts to take adverse
actions are enforceable through judicial review if necessary, at least absent the
clearest expression of Congressional intent to the contrary."[75]

*Martin* did not announce a general principle that judicial review of an
otherwise unreviewable agency decision is available whenever the claim is that the

---

[72]  *Id.* at 993–94 (emphasis added).

[73]  *Id.* at 994.

[74]  *Id.*

[75]  *Id.* at 994–95.

agency failed to follow its own regulations. The availability of judicial review in such circumstances always turns on a case-by-case assessment of whether there is clear and convincing evidence that the legislature intended to entirely preclude judicial review or not.

Although we found such evidence lacking in *Martin*, we have not found it lacking here. Appellants in this case are not in the same position as Mr. Martin. The statutes we construe here more explicitly foreclose judicial review, by affirmatively stating that COST "shall have final authority to appoint, reappoint, discipline, and remove" ALJs and that ALJs are excepted service employees who "do not have any right to appeal their termination." The fact that appellants have based their claims on alleged procedural missteps does not alter our conclusion. As Judge Pasichow said below, "[f]or the Court to exercise jurisdiction simply because an . . . employee mentions issues with the procedures that led to [removal or] the decision not to reappoint . . . would thwart the clear intent of the Council to preclude judicial review." Accordingly, we reject appellants' argument that *Martin* provides a basis for review in this case.

## 2. The Holdover Voting Members

Appellants' final argument for judicial review is based on defects in COST's composition. Appellants maintain that because certain voting members of COST lacked authority to act outside of their fixed term appointments, its decisions must now be vacated.[76]

Preliminarily, we think appellant Goode's situation with respect to this argument is materially different from that of his co-appellants. By the time COST rendered its decision not to reappoint Mr. Goode, Judge Williams and Commissioner Onek had been validly reappointed as voting members, and Commissioner Cooper had been replaced by Commissioner Hawkins. Mr. Goode therefore does not have a viable claim that COST was illegally constituted when it made the decision not to reappoint him.[77]

---

[76] Appellants do not dispute the validity of Judge Williams and Commissioner Onek's belated reappointments to COST on August 1, 2017 and September 22, 2017. Appellants' focus is on the periods between the end of their initial terms and the start of their reappointments (and on the period in which Commissioner Cooper continued to serve as a voting member after his term expired).

[77] It is worth adding that Mr. Goode, through his counsel, requested that COST defer its decision in his case until Commissioner Onek's reappointment was confirmed. That is exactly what COST did. Mr. Goode cannot complain that he got what he asked for.

Unlike Mr. Goode, appellants Barber and Hines have demonstrated that voting members whose terms had expired did participate inappropriately in COST's decisions to remove or not reappoint them. Judge Williams and Commissioner Cooper were not authorized to vote on the retention of Ms. Barber and Ms. Hines because their terms of appointment to COST had expired when those votes took place (and Judge Williams had not yet been appointed to a new term). Judicial review generally is available to restrain an agency from acting outside its lawful authority if it is unlawfully constituted.[78] But that proposition is qualified by what has come to be known as the *de facto* officer doctrine.

---

[78] *See District of Columbia v. 17M Assocs., LLC*, 98 A.3d 954, 959 (D.C. 2014) ("'[The purported exercise of jurisdiction beyond that conferred upon the agency by the legislature is ultra vires and a nullity.'") (quoting *District Intown Props., Ltd. v. District of Columbia Dep't of Consumer & Regul. Affs.*, 680 A.2d 1373, 1379 (D.C. 1996)); *Lyng v. Payne*, 476 U.S. 926, 937 (1986) ("[A]n agency's power is no greater than that delegated to it by Congress"); *Savage v. District of Columbia*, 54 A.2d 562, 565 (D.C. 1947) (noting that agencies "are creatures of statute, possessing no inherent powers"); *State v. Windom*, 155 N.W. 629, 631 (Minn. 1915) ("When the term of office is fixed by statute, and there is no provision . . . for holding over, the term is definite, and a vacancy exists upon the termination of the period. This is settled [law] . . . in accordance with authority elsewhere"); *Fay v. MacFarland*, 32 App. D.C. 295, 299 (D.C. Cir. 1908) (noting that administrative agencies "are creatures of statute. They possess no implied powers. Their authority to act must be gathered from the express terms of the law granting it.").

The *de facto* officer doctrine is an ancient one, dating back to medieval times.[79] It "confers validity upon acts performed under the color of official title even though it is later discovered that the legality of the actor's appointment or election to office is deficient."[80] The doctrine has pragmatic roots, as it is grounded in "the fear of the chaos that would result from multiple and repetitious suits challenging every action taken by every official whose claim to office could be open to question, and seeks to protect the public by insuring the orderly functioning of the government despite technical defects in title to office."[81] With this policy in mind, the Supreme Court held in *Nguyen v. United States*[82] that the doctrine's applicability hinges on the nature of the flaw in an officer's appointment. Where the "defect of statutory authority" is "merely technical," the Court explained, an officer's acts are usually

---

[79] *SW Gen., Inc. v. NLRB*, 796 F.3d 67, 81 (D.C. Cir. 2015) (noting that "[t]he first reported case to discuss the concept of de facto authority was The Abbe of Fountaine, 9 Hen. VI, at 32(3) (1431)") (internal citation omitted).

[80] *Ryder v. United State*s, 515 U.S. 177, 180 (1995).

[81] *Id.* (quoting 63A Am. Jur. 2d, Public Officers and Employees § 578, 1080–1081 (1984) (footnote omitted)); *see also Cardoza v. Baird,* 30 App. D.C. 86, 91 (D.C. 1907) ("Where an office exists under the law, it matters not how the appointment of the incumbent is made, so far as the validity of his acts are concerned. It is enough that he is clothed with the insignia of the office, and exercises its powers and functions.") (internal citation and quotation marks omitted).

[82] 539 U.S. 69 (2003).

"found . . . to be valid de facto."[83]  Where, however, the challenged act is not one "which could have been taken if properly pursued" but rather "one which could never have been taken at all," the *de facto* officer doctrine has no effect.[84]

Although we do not have the benefit of recent precedent from our court on this subject, cases from other courts finding that the *de facto* officer doctrine covers individuals who hold over beyond the end of their fixed statutory terms are legion. Similar to the present cases, these authorities all concern appointments that — for one reason or another — endured longer than the law permitted.  In almost every instance the *de facto* officer doctrine was deemed applicable.[85]

---

[83]  *Id.* at 77.

[84]  *Id.* at 79.

[85]  *See, e.g.*, *Heyward v. Long*, 183 S.E. 145, 151 (S.C. 1935) ("[O]ne who holds over after the expiration of his legal term, where no provision is made by law for his holding over, is commonly regarded as a *de facto* officer."); *Walberg v. State*, 243 N.W.2d 190, 198 (Wis. 1976) (arrest warrant was valid despite being issued by court commissioner after his term expired); *Case v. Liquor Control Comm.,* 23 N.W.2d 109, 113 (Mich. 1946) ("We have found much authority to the effect that officers holding over after their term has expired or their authority vacated still are *de facto* officers, and their acts as such are legal.  The decisions are uniform in permitting old boards to continue acting until actually displaced.") (collecting cases); *Lathon v. Cumberland Cty.*, 646 S.E.2d 565, 569 (N.C. Ct. App. 2007) (properly appointed industrial commissioners were *de facto* officers even if "they were unable to continue serving after their terms expired"); *D'Amato v. S.D. Warren Co.*, 832 A.2d 794, 803 (Me. 2003) (applying *de facto* officer doctrine to validate the decision of hearing officer entered ten days after her term expired); *Vill. of Canaseraga v. Green*, 88 N.Y.S. 539, 542 (Co. Ct. 1903) (holdover water

Appellants have given us no strong reason to deviate from this well-settled principle here. They have not alleged that COST "could never have" made the decisions not to reappoint or to remove them,[86] and they acknowledge that COST's

_____

commissioner was a *de facto* officer "although his term of office had expired"); *Equal Emp. Opportunity Comm'n v. Sears, Roebuck & Co.*, 504 F. Supp. 241, 262 (N.D. Ill. 1980) (*de facto* officer doctrine covered agency commissioner who acted after his term had expired and outside the statutory holdover period); *Gillson v. Heffernan*, 192 A.2d 577, 581–83 (N.J. 1963) (applying *de facto* officer doctrine to holdover appointees of a planning board); *Baker v. State*, 833 A.2d 1070 (Md. Ct. App. 2003) ("The *de facto* officer doctrine has been applied to validate . . . [decisions] taken by a judge that were made after the expiration of the judicial term of the judge taking it, to a judge sitting beyond the term in which elected, [and] to a judge continuing to sit past retirement age.") (citing *Brown v. Lunt*, 37 Me. 423, 432 (Me. 1854) (justice of the peace "holding over the time limited by his commission" was a *de facto* officer)); *Ridout v. State*, 30 S.W.2d 255, 259 (Tenn. 1930) (official acts of a judge sitting beyond his elected term are valid *de facto*); and *Sylvia Lake Co. v. N. Ore Co.*, 151 N.E. 158, 159 (N.Y. Ct. App. 1926)).

The sole case appellants cite for the proposition that the *de facto* officer doctrine is not always applied in holdover situations was based on far more egregious facts; it involved a nine-member city planning board on which five individuals had served for almost four years beyond the expiration of their terms, along with one other who was never eligible for appointment in the first place. *See City of Hoboken v. City of Jersey City*, 789 A.2d 668, 677 (N.J. Super. Ct. Law Div. 2001) (reasoning that "[t]he indifference to, indeed outright contempt for the statutory requirements . . . shown by the appointing authority of Jersey City, as it relates to the composition of the Planning Board, cannot find judicial countenance through a mechanical application of the de facto officer doctrine.").

[86] *Nguyen*, 593 U.S. at 79; *cf. Ryder v. United States*, 515 U.S. at 179 (*de facto* officer doctrine did not apply where petitioner made a "timely challenge to the constitutional validity" of the officer's appointment); *Wrenn v. District of Columbia*, 808 F.3d 81, 83–84 (D.C. Cir. 2015) (*de facto* officer doctrine did not apply to order issued by visiting district court judge in a case that was outside of the judge's limited designation).

voting members were initially appointed by the correct authorities, i.e., the Mayor, the Council, and the Chief Judge of Superior Court.

It certainly is not ideal that Judge Williams and Commissioner Cooper continued to serve as voting members on COST after their statutory terms had ended. Nevertheless, the weight of prevailing authority firmly establishes that this fact alone is not enough to justify a judicial override, let alone judicial review that would otherwise be precluded.[87] To the contrary, this is exactly the kind of technical flaw in an otherwise acceptable appointment that the *de facto* officer doctrine is meant to cover.[88]

---

[87] *See Iowa Farm Bureau Fed'n v. Envtl. Prot. Comm'n*, 850 N.W.2d 403, 430 (Iowa 2014) ("To err is human, and errors in the process of government that are . . . technical in nature should not require government action predicated on that error to be undone."); *see also Grooms v. LaVale Zoning Bd.*, 340 A.2d 385, 391 (Md. Ct. App. 1975) ("[T]he Court of Appeals has recognized that an elected or appointed officer may remain in office at the expiration of his term and is entitled to exercise the powers of the office until his successor qualifies, whether or not the statute creating the office so provides.") (collecting cases).

[88] *See Acevedo v. Cook Cnty. Sheriff's Merit Bd.*, 129 N.E.3d 658, 668–69 (Ill. App. Ct. 2019) ("[A]ll of the appointment defects alleged in the first amended complaint relate only to the technical requirements of appointments — length of terms and timing of appointment approval. . . . Accordingly, it appears to us that the appointments in this case fall within the technical defect category as defined by the *Nguyen* court.").

We do not mean to disagree with the D.C. Circuit, which "has rejected the traditional version of the *de facto* officer doctrine" in favor of a slightly modified version.[89]  The D.C. Circuit has held that the *de facto* officer doctrine is inapplicable when two conditions are met: "First, the plaintiff must bring his action at or around the time the challenged action is taken.  Second, the plaintiff must show that the agency or department involved has had reasonable notice under all the circumstances of the claimed defect in the official's title to office."[90]  To satisfy this second requirement, the plaintiff must show that the agency had actual knowledge of the defect.[91]

Even assuming appellants could show their challenges met the first condition, which is debatable,[92] they did not show that the second condition — COST's actual knowledge of the defects — was met.  So far as the record indicates, COST was not

---

[89]  *SW Gen., Inc.*, 796 F.3d at 81.

[90]  *Andrade v. Lauer*, 729 F.2d 1475, 1499 (D.C. Cir. 1984).

[91]  *SW Gen., Inc.*, 796 F.3d at 81 ("To meet this requirement, the agency ... [must] actually know[ ] of the claimed defect. . . . the notice requirement is satisfied if the agency learns of the defect from any source, not only the petitioner.") (internal citation and quotation marks admitted).

[92]  Unlike in *SW Gen.*, appellants Barber and Hines did not raise the appointment defects in the proceedings before COST.  It appears they did not raise the issue until September 2018 at the earliest.

aware of the holdover problem in connection with Judge Williams and Commissioner Cooper until OOG issued its report in October 2017 (by which time Judge Williams had been reappointed and Commissioner Cooper had been replaced).

We therefore conclude that appellants' challenges to COST's composition does not entitle them to judicial review of its removal and non-reappointment decisions.

## III. Conclusion

In sum, we hold that COST's decisions concerning the appointment, removal, discipline, and reappointment of ALJs under § 2-1831.06(b) are not subject to judicial review. Appellants have not shown that they are exempt from this rule. Accordingly, we affirm the judgments of the Superior Court.